INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Plaintiff-Appellee,

v.

GENERAL ELECTRIC COMPANY, Defendant-Appellant.

No. 69, Docket 32274.

United States Court of Appeals Second Circuit.

Argued Sept. 18, 1968.

Decided Dec. 27, 1968.

Certiorari Denied May 19, 1969. See 89 S.Ct. 1742, 1746.

granting the motion of appellee International Union of Electrical, Radio and Machine Workers ("Union") to compel appellant General Electric Company ("Company") to submit certain grievances to arbitration. One of these grievances arose under the 1960–1963 National Agreement between the parties. The other six,[1] arising under their 1963–1966 National Agreement, present this court with the difficult task of applying unusually complex contractual language to a variety of factual situations within the framework of the broad federal principles of arbitrability enunciated in the Steelworkers trilogy. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L. Ed.2d 1424 (1960). For reasons given below, we affirm the order requiring arbitration as to four of the grievances and reverse as to three, with the writer of this opinion differing from his brothers as to the disposition of one grievance (N.D. 8290).

David L. Benetar, New York City (Nordlinger, Riegelman, Benetar & Charney, Thomas F. Hilbert, Jr., Michael I. Bernstein, New York City, on the brief), for defendant-appellant.

Robert Friedman, New York City (Irving Abramson, New York City, on the brief), for plaintiff-appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal is from a judgment of the United States District Court for the Southern District of New York, Edward Weinfeld, J., 278 F.Supp. 991 (1968),

I

It is well established that whether the parties to a bargaining contract have agreed to submit specific issues to arbitration is for the court to determine. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); see John Wiley & Sons v. Livingston, 376 U.S. 543, 546–547, 84 S. Ct. 909, 11 L.Ed.2d 898 (1964).[2] When the question is raised under an agreement containing a broad or "standard" arbitration clause, this is now not usually

---

1. An eighth grievance is not pressed on this appeal.

2. This is clearly not a case in which the parties "have provided that any dispute as to whether a particular claim is within the arbitration clause is itself for the arbitrator." American Mfg. Co., 363 U.S. at 571, 80 S.Ct. at 1364. Both contracts specifically provide that in the event of

disagreement as to arbitrability, the American Arbitration Association "shall have authority to process the request for arbitration * * * only after a final judgment of a Court has determined that the grievance upon which arbitration has been requested raises arbitrable issues and has directed arbitration of such issues."

a difficult issue; the court's function is limited to determining whether there is any reasonable construction of the arbitration clause that would cover the grievance on its face and whether any other provision of the contract specifically excludes it. Under the *Steelworkers* doctrine:

> Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement.

> \* \* \* \* \* \*

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*Warrior & Gulf*, 363 U.S. at 581, 582–583, 80 S.Ct. at 1352.

The contract in dispute in *Warrior & Gulf* called for arbitration of "differences \* \* \* as to the meaning and application of the provisions of this Agreement," 363 U.S. at 576, 80 S.Ct. at 1349; in *American Mfg. Co.*, its companion case, the arbitration provision covered: "Any disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation and application of the provisions of this agreement." 363 U.S. at 565 n. 1, 80 S.Ct. at 1345.[3] Similarly sweeping, "standard" arbitration clauses have frequently been construed by the

federal courts subsequent to the *Steelworkers* trilogy to require arbitration of any grievance not expressly excluded, without weighing the claim on the merits. See, e. g., John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Communications Workers of America v. Bell Telephone Laboratories, Inc., 349 F.2d 398 (3d Cir. 1965); General Warehousemen and Emp. Union No. 636 v. American Hardware Supply Co., 329 F.2d 789 (3d Cir.), cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964); Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 298 F.2d 644 (2d Cir. 1962).

The arbitration provisions in the 1963–1966 Agreement here in issue, however, are considerably more detailed and limited than the typically general language of an ordinary arbitration clause. Rather than being an agreement in which "the parties have agreed to submit all questions of contract interpretation to the arbitrator," *American Mfg. Co.*, 363 U.S. at 567–568, 80 S.Ct. at 1346, or in which "the exclusion clause is vague and the arbitration clause quite broad," *Warrior & Gulf*, 363 U.S. at 585, 80 S.Ct. at 1354, the 1963 contract attempts to delineate a more restricted area of arbitrability. Indeed, it is clear that the language of the 1960 Agreement[4] was extensively revised in the 1963 Agreement in a deliberate effort to limit the scope of arbitration established by the *Steelworkers* trilogy.[5]

Article XV of the 1963 Agreement contains unusually lengthy and compli-

---

3. Similarly, the contract in the third case of the trilogy provided for arbitration of any differences "as to the meaning and application" of the agreement. *Enterprise Corp.*, 363 U.S. at 594, 80 S.Ct. at 1359. While this decision concerned enforcement of an arbitrator's award, and is thus not directly applicable to the present controversy, it also reflects the Court's preference for resolution of labor disputes by arbitration rather than by judicial determination.

4. The 1960 arbitration clause is a typical "standard" type, providing for arbitra-

tion of "the interpretation or application of a provision of this Agreement"; "a disciplinary penalty" is also arbitrable.

5. See Jones & Smith, The Impact of the Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators, and Parties, 52 Va.L.Rev. 831, 904 n. 181 (1966): "Of all the recently negotiated provisions containing restrictions on the arbitration process and attempts to shore up 'management rights' perhaps the most elaborate and tightly drawn are contained in the General Electric Company-IUE agreement of 1963."

cated provisions. Section 1, the bulk of which appeared in the 1960 Agreement, begins with a broad provision allowing, but not requiring,[6] arbitration of any grievance involving either "the interpretation or application of a provision" of the Agreement or a "disciplinary penalty." However, section 4(b), which is new, divides arbitrable questions into two categories: those subject to arbitration as a matter of right and those subject only to voluntary arbitration, i. e., by the written agreement of both parties as to a particular dispute. The first category is defined in section 6:

> (a) Arbitration as a matter of right includes only requests to arbitrate which involve:
>
>> (i) Disciplinary action (including discharge) but with certain exceptions spelled out in this Article;
>>
>> (ii) The claimed violation of a specific provision or provisions of the National Agreement (with the limitations and exceptions set out in this Article); * * *[7]
>
> (b) A request for arbitration, in order to be subject to arbitration as a matter of right * * * must allege a direct violation of the express purpose of the contractual provision in question, rather than of an indirect or implied purpose. For example, a request which claims incorrect application of the method of computing overtime pay under the provisions of Section 2 of Article V would be arbitrable as a matter of right, whereas a request which questioned the right of the Company to require the performance of reasonable overtime work, on the claimed ground that Article V contains an implied limitation of that right, would be subject only to voluntary arbitration. A request that Article XI and the appropriate Local Seniority Supplement had been violated by the lay-

off of a senior employee in preference to a junior employee would be arbitrable as a matter of right but a request that subcontracting of work in the plant while bargaining unit employees are on layoff violated a claimed implied limitation of Article XI and the applicable Local Seniority Supplement would be subject only to voluntary arbitration.

Section 7 states:

> All requests for arbitration which are not subject to arbitration as a matter of right under the provisions of Section 6 above, are subject only to voluntary arbitration. In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they
>
> \* \* \* \* \* \*
>
> (c) Involve claims that an allegedly implied or assumed obligation of this National Agreement has been violated.

Finally, section 4(b) adds a number of further criteria:

> (iii) This Agreement sets out expressly all the restrictions and obligations assumed by the respective parties, and no implied restrictions or obligations inhere in this Agreement or were assumed by the parties in entering into this Agreement.
>
> (iv) In the consideration of whether a matter is subject to arbitration as a matter of right, a fundamental principle shall be that the Company retains all its rights to manage the business, including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to direct the work force and to con-

---

6. The 1960 Agreement provides that any grievance "which involves * * * the interpretation or application of a provision of this Agreement * * * *shall* be submitted to arbitration." (Emphasis added.) The 1963 Agreement uses the word "may," since some of this broad group of grievances are now arbitrable only by mutual consent.

7. A third provision is not relevant to this discussion.

duct its operations in a safe and effective manner, subject only to the express limitations set forth in this National Agreement * * * and it is understood that the parties have not agreed to arbitrate demands which challenge action taken by the Company in the exercise of any such rights, except where such challenge is based upon a violation of any such express limitations (other than those set out in Section 7 below).

(v) No matter will be considered arbitrable unless it is found that the parties clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth in this Article and no court or arbitrator shall or may proceed under any presumption that a request to arbitrate is arbitrable.

The immediate effect of reading these provisions is a nostalgic reminder that use of the "standard" arbitration clause, combined with the *Steelworkers* test, considerably eases the task of courts in deciding when to order arbitration. When an arbitration clause begins to resemble a trust indenture, one wonders what gain there is for either party in agreeing to arbitrate at all, other than the questionable joys of litigation. Nevertheless, we cannot avoid grappling with the contract the parties have given us. The Union's construction of all the quoted prose is simply that it has no effect whatsoever. The Union contends that despite any of these clauses all grievances involving disciplinary actions or the *interpretation or application* of the Agreement are still arbitrable as of right; that the language is not sufficiently clear and unambiguous either to exclude any subject matter from arbitration or to reverse the presumption of arbitrability; in short, that we are faced with exactly the sort of unrestricted arbitration clause to which the *Steelworkers* cases were directed. But the 1963 contract is obviously different from the agreements in those cases. Arbitration as of right is clearly limited to matters involving "disciplinary action" and "claimed violation of a specific provision" of the Agreement; an "implied or assumed obligation" is specifically excluded from arbitration as a matter of right; "violation of a specific provision" is further qualified as "a direct violation of the express purpose of the contractual provision"; examples are given in an attempt to clarify the difference between an "express" and an "implied" purpose; a court is told that no matter is arbitrable unless it finds that the parties "clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth" in the contract; and finally, a court is instructed not to "proceed under any presumption" of arbitrability.

Before assessing the effect of these provisions, it may be helpful to analyze briefly some of the types of questions that may arise: (1) Does the contract contain the "substantive commitment"[8] that a union must prove in order to succeed on the merits in the arbitration proceeding? Before the trilogy, it was common for courts to spend much time and effort on this issue; frequently, arbitration would be refused on the ground that the union could not win on the merits. Thus, in International Ass'n of Machinists, Dist. No. 15, Local No. 402 v. Cutler-Hammer, Inc.,[9] the court held that a promise to "discuss" bonuses was so clearly not a commitment to grant one that there was no sense arbitrating about it. The trilogy accorded *Cutler-Hammer* the dubious distinction of being singled out for disapproval. See *American Mfg. Co.*, 363 U.S. at 566–567, 80 S.Ct. 1343. (2) Assuming that the contract contains the substantive commitment upon which

8. Smith & Jones, The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law, 63 Mich.L.Rev. 751, 781 (1965).

9. 271 App.Div. 917, 67 N.Y.S.2d 317, aff'd, 297 N.Y. 519, 74 N.E.2d 464 (1947).

a union relies, do the facts support the union claim? For example, a contract may provide that a company cannot change hourly rates unless the union agrees but may allow the company to change piece rates without restraint. If the union says that a changed rate is hourly, while the company resists arbitration with the claim that it is a piece rate, the issue is purely factual. (3) Does the arbitration clause cover the dispute? This will require examination and construction first of the language committing disputes to arbitration and then of any clause excluding certain disputes from arbitration.

■ We turn back now to the extensive changes in the 1963 Agreement. Two apparent purposes of these varied formulations are to eliminate compulsory arbitration of claims based upon implied rather than express obligations and to nullify the presumption of arbitrability of the *Steelworkers* trilogy. The former restriction raises a type of question labelled (1) above, since it authorizes a limited examination of the substantive commitment upon which the Union relies; i. e., is the contractual obligation ultimately relied on express or implied? Even though the line between implied and express often shades into imperceptibility, that purpose cannot in all conscience be ignored. We believe that the extensive revisions in 1963 require the party invoking arbitration under Article XV, section 6(a) (ii) at least to point to specific contract language which covers the subject of the grievance.[10]

■ We have more doubt as to the effect of the admonition not to apply a presumption of arbitrability. First, ignoring a presumption still requires us to search for controlling doctrine. In addition, there is a substantial question whether "national labor policy" may be so blithely diluted.[11] Moreover, the command not to presume does not distinguish among the three types of issues described above. As to type (2)—where the substantive commitment is clear but the facts are not—which party's version is correct should determine the merits of the dispute, but ordinarily not its arbitrability. See Los Angeles Paper Bag Co. v. Printing Specialties and Paper Products Union, 345 F.2d 757 (9th Cir. 1965); but cf. District 50, United Mine Workers of America v. Chris-Craft Corp., 385 F.2d 946 (6th Cir. 1967). Otherwise, in order to decide whether a case is arbitrable, a court would have to try it on the merits, e. g., determine whether the rate was hourly or piece in the type (2) hypothetical given above.[12] We think that as to this type of question, a command to ignore a presumption of arbitrability would have to be much more specific to be effective. In any event, with that exception, we need not decide the effect of this part of the 1963 Agreement because we do not rely on any general presumption in deciding the arbitrability of the particular grievances at issue.

Finally, we recognize that our role is still not to appraise the merits but to determine whether the Agreement's more rigorous test of prima facie arbitrability is met. We leave to further discussion below such issues as the effect of exclusionary language, once that higher

---

10. Reliance upon section 6(a) (i) (discipline) for arbitrability raises special considerations, discussed below in Part III of the opinion.

11. See John Wiley & Sons v. Livingston, 376 U.S. 543, 550 n. 4, 84 S.Ct. 909, 915, 11 L.Ed.2d 898 (1964): "[N]ational labor policy requires, within reason, that 'an interpretation that covers the asserted dispute' * * * be favored."

12. We do not foreclose the possibility that a union's claim might be so totally devoid of possible merit on the facts or the evidence of bad faith on its part so patent as to justify the court in an appropriate case in refusing to submit the grievance to arbitration. It may be that where the union's claim is clearly unconscionable, "a perversion of the grievance procedure," Local Union No. 787, IUE, Radio and Machine Workers, A.F.L.-C.I.O. v. Collins Radio Co., 317 F.2d 214, 220 (5th Cir. 1963), the court should deny it the deference accorded to even "frivolous" matters.

threshold has been crossed, and the arbitrability of claims under Article XV, section 6(a) (ii) that "discipline" has been improperly imposed.

Accordingly, with the provisions of this unusual contract in mind we turn to the first four grievances before us and other pertinent contract clauses. In each case we will ascertain whether the grievance involves a "claimed violation of a specific provision," as defined above, and then determine whether any other provision of the Agreement, not yet discussed, specifically excludes it from arbitration.

## II

Four of the grievances pressed under the 1963 Agreement involve disputes over piece-rate prices paid employees for certain operations. Article VI of the Agreement provides in part:

4. *Piece Prices—Hourly Rated Piecework Employees*

(a) Piece prices are classified as standard, temporary or special and all piecework vouchers will indicate the classification.

(1) *A Standard Piece Price* is one set where the manufacturing method has become established.

(2) *A Temporary Piece Price* is one set where the manufacturing method is under development or has been changed, or the average pieceworker on the job has not yet attained normal performance.

(3) *A Special Piece Price* is one set on work which usually repeats infrequently or is in small quantities or has some special feature or purpose.

(b) There will be no change in a standard price except where there is a change in manufacturing method.

\* \* \* \* \* \*

(c) Subject to the foregoing, the Company will replace a temporary price with a standard price within six months if reasonably possible under the circumstances.

This language also appeared in the 1960 Agreement.

### N.D. 8427 and 8643

The first two grievances are over Special piece prices. N.D. 8427 involves the Pittsfield tap selector piece price, which the Company claims and the Union does not deny has been Special for twenty years. The Union contends that the Company has failed to set a Standard piece rate on the job, that it has returned to the manufacturing method previously used when the price was Standard, and that the Standard price should thus be reinstated. N.D. 8643 involves a Pittsfield shear operation piece price, which has always been Special. The Union contends that it has been changed to a new Special rate, and that this change is unauthorized because unaccompanied by any change in manufacturing method.

■■ The Union rests its claim for arbitration on an alleged violation of Article VI, section 4, set out above. But the Union cites no specific language which even deals with restraints upon the Company in setting new Special piece prices or altering the method of manufacture on such jobs. Section 4(b) is directed at Standard prices only. Section 4(c) deals only with failure to replace Temporary with Standard rates in timely fashion. Since it is uncontradicted that the rates here are Special, sections 4(b) and 4(c) do not apply. It is true that the Union has gone through the form of citing a section of the contract, which it says has been violated. But under these complex arbitration provisions it must do more; it must at least rely on specific language that arguably expressly covers the "subject" of the grievance.[13] It has not done so here. As the Union does not indicate any other

---

13. See Boeing Co. v. International Union, United Auto, Aerospace, and Agricultural Implement Workers of America, Local 1069, 349 F.2d 412 (3d Cir. 1965); Independent Petroleum Workers of America, Inc. v. American Oil Co., 324 F.2d 903 (7th Cir.), aff'd by an equally divided Court, 379 U.S. 130, 85 S.Ct. 271, 13 L.

provision violated by the Company's actions in these two instances, the grievances are not arbitrable as of right under Article XV, section 6(a) (ii). Accordingly, we reverse the judgment of the district court as to them.

*N.D. 9280 and 9349*

N.D. 9280 and 9349 concern changes made in 1963 and 1964 in price rates for power transformer cover welder and layout tack weld-weld bases. In both grievances, the Union claims that the piece prices prior to the changes were Standard and that the changes were made without a change in manufacturing method in violation of Article VI, section 4. The Company denies that the prices were Standard at the time of the changes in question, asserting that they have been Temporary or Special for many years.

█ These grievances fall squarely within the language of section 4(b). Since the Union contends that the prices were Standard and were changed without a corresponding manufacturing change, it raises a "claimed violation of a specific provision" of the Agreement under Article XV, section 6(a) (ii). The subject of the grievance—restraint upon changes in Standard rates—is clearly covered by the contract. The Company's position that the prices were not Standard raises a factual issue, which—as we have pointed out—goes to the merits of the dispute, rather than its arbitrability. Accordingly, unless other exclusionary language is controlling, the Union is entitled to arbitration as a matter of right on the issues whether the prices were Standard and were changed without a change in method of manufacturing.

However, the Company argues that arbitration of these two grievances is expressly barred by Article XV, section 7:

> In particular, it is specifically agreed that arbitration requests shall

be subject only to voluntary arbitration, by mutual agreement, if they

\* \* \* \* \* \*

> (e) Would require an arbitrator to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employee shall be paid, or the method (day, salary or incentive) by which his pay shall be determined. (See footnote.)

\* \* \* \* \* \*

> Footnote: [Subsection] e \* \* \* above reflect[s] the fact that this National Agreement does not set out specific rates or classifications for jobs, and [is] designed to confirm the intent of Article VI, Section 1 and Article VI, Section 5 (first sentence) that disputes over individual job classifications, rates of pay, incentive standards, etc., are assigned by the parties to local negotiations, and not to arbitration.

Article VI, section 1, referred to in the Footnote, provides:

> 1. Any question which affects hourly rates, piecework rates or salary rates of individuals or groups shall be subject to negotiation between the Local and the local Management.

█ The Company claims that in deciding whether these rates were changed improperly, an arbitrator will necessarily "consider, rule on or decide the appropriate \* \* \* incentive rate" to be paid for the operations in question. While this argument may be literally correct, we do not think that this is the type of rate dispute which section 7(e) was intended to exclude. The language of the section suggests that its purpose was to preclude arbitration of the adequacy of pay rates for particular individuals or jobs, or the method of determining them "(day, salary or incentive)," types of assessment ordinarily concluded at the bargaining table. The dispute here, however, is not how much a given job is

Ed.2d 333 (1964). If "it is the plaintiff's position that the mere allegation that the agreement has been violated, ipso facto, entitles it to arbitration," that position "is devoid of all logic." Id., 324 F.2d at 906–907.

worth, or whether it should be paid by a day or incentive rate, but whether the Company has complied with contract conditions in changing established rates. Thus, the arbitrator is not called upon to evaluate what an "appropriate" rate should be, but to determine whether the present rate was established by the Company in violation of its agreement.[14] This court made a similar distinction in a prior litigation involving the present parties. In Carey v. General Electric Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964), the Company contended that a provision in its 1960 Agreement with the Union:

> It is specifically agreed that no arbitrator shall have the authority to establish or modify any wage, salary or piece rate, or job classification or authority to decide the appropriate classification of any employee,

excluded the subject matter of the grievances [15] from arbitration. In rejecting this argument, we noted, 315 F.2d at 507:

> The clause was obviously designed to prevent the arbitrator from making the type of decision which is normally reserved for the parties at the bargaining table. Thus, the arbitrator cannot establish wage rates or job classifications where none existed before and cannot modify those rates and classifications which have been hammered out at the bargaining table. * * * Such remedies partake more of "legislation" than adjudication, and our reading of the

limiting clause merely gives effect to the parties' apparent intention to restrain the arbitrator from exercising a legislative function. The employer argues that the arbitrator necessarily "establishes or modifies" a wage rate or job classification whenever he declares improper some wage or job decision of the employer; in short, that there is an unauthorized "modification" whenever the arbitrator suggests a change in the status quo. We cannot adopt such a construction of the limiting clause. If a change in the status quo is necessitated by an interpretation of the collective bargaining agreement, then it is not an unauthorized modification.

Similar limiting clauses have consistently been construed not to apply to disputes such as those here in question. See, e. g., Desert Coca Cola Bottling Co. v. General Sales Drivers Local 14, 335 F.2d 198 (9th Cir. 1964); Radio Corporation of America v. Association of Professional Engineering Personnel, 291 F.2d 105 (3d Cir.), cert. denied, 368 U.S. 898, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); IUE v. Westinghouse Electric Corp., 169 F.Supp. 798 (W.D.Pa. 1958), aff'd, 268 F.2d 352 (3d Cir. 1959).

■■ The Company contends that it changed the exclusionary clause at issue in Carey v. General Electric to the broader "consider, rule on or decide" language of the 1963 Agreement precisely to make it clear that grievances of this sort were meant to be arbitrable. While it is true that the 1963 clause

---

14. The very broad scope which the Company claims for section 7(e) is inconsistent with another provision of the arbitration article, section 6(b), which states in part:
 For example, a request which claims incorrect application of the method of computing overtime pay under the provisions of Section 2 of Article V would be arbitrable as a matter of right * *. Surely, such a grievance would compel the arbitrator to "consider, rule on or decide" the appropriate pay rate or method of determination as literally as would a claim of an incorrect application of the provisions for changing Standard piece prices.

15. The grievances included the Company's allegedly wrongful reclassification of employees to positions at lower rates of pay, reclassification on the basis of improper seniority credit, unauthorized conversion of employees from hourly to salary pay, and retroactive deduction of employees' earnings which the Company claimed were paid in excess.

is stronger than its predecessor, it fails to meet the high standard of specificity still demanded by the *Steelworkers* trilogy to exclude otherwise arbitrable disputes. Following that principle, this court has insisted that exclusionary clauses be "clear and unambiguous," Communications Workers of America, A.F.L.-C.I.O. v. New York Telephone Co., 327 F.2d 94, 96 (2d Cir. 1964), "garbed in unmistakably clear language," Carey v. General Electric, 315 F.2d at 507. It is true that the strict requirements of clarity for exclusionary language have been enunciated largely in cases dealing with broad, "standard" arbitration clauses, and there may well be labor contracts in which a very narrowly drawn arbitration clause would suggest a more liberal construction of exclusionary provisions. However, we do not regard this as such a contract, even though, as pointed out above, its arbitration provisions are less expansive than those of its predecessor. More-over, even if the command of the Agreement not to "proceed under any presumption" of arbitrability could overrule this line of cases,[16] we regard that language as inapplicable where the determination that a dispute is arbitrable has already been made not by use of such a presumption but only on the basis of the limited language of the contract, and the only question left is the effect of specific exclusionary language.

Although it is not easy to state in the abstract "how specific the provision must be," Strauss v. Silvercup Bakers, Inc., 353 F.2d 555, 557 (2d Cir. 1965), Article XV, section 7(e) is not sufficiently free from ambiguity to exclude all violations of Article VI, section 4. Since the parties agreed to limit the scope of arbitration to violations of specific provisions of the Agreement, it would be reasonable to expect that if they had meant to exclude any such provision from arbitration completely, they would have done so by referring to it individually. In fact, section 7

does expressly set out a number of specific provisions whose violation is excluded from arbitration, see sections 7(d), (h), (k), (*l*). The parties' failure specifically to designate Article VI, section 4, as one of these excluded provisions lends additional weight to our construction of Article XV, section 7(e), as inapplicable to a dispute whether specified incentive rates were Standard and, if so, were changed without a change in the manufacturing method. Consequently, we hold that the district court was correct in ordering N.D. 9280 and 9349 to arbitration, but we emphasize that the issues to be arbitrated are limited. For example, the arbitrator cannot pass upon the adequacy of the new rate in any way, although if he concludes that the old rate was Standard and that the change in rate was not accompanied by a change in manufacturing method, he can order the old rate reinstated, if he sees fit.

### III

We turn now to two grievances brought under Article XV, section 6(a) (i), which requires arbitration as a matter of right of "requests to arbitrate which involve * * * [d]isciplinary action." Despite the care lavished elsewhere in the arbitration provisions, the parties have not defined "discipline" except to provide in broad terms that

> the standard to be applied by an arbitrator to cases involving disciplinary penalties (including discharge) is that such penalties shall be imposed only for just cause.

Article XV, section 1. Moreover, Article XV gives preferred status to arbitrability of claims under section 6(a) (i) that discipline has been improperly imposed. Thus, sections 3(a) and 4(a) both provide that claims of improperly imposed discipline, if disputed, may proceed to arbitration without the judicial determination of arbitrability which the sections require for all other dis-

16. See note 11 supra and accompanying text.

puted arbitration requests.[17] Similarly, section 8 even provides for a summary decision without opinion by the arbitrator on the request of either party in some kinds of discipline cases. In addition, section 7(j) excludes from arbitration as a matter of right disciplinary measures imposed upon employees with less than six months of service with the Company. Thus, the arbitration provisions treat requests to arbitrate disciplinary action much differently from requests to arbitrate claimed violations of a specific provision of the Agreement under section 6(a) (ii). As to the former, the arbitration clause is broad and generally unqualified and the parties have emphasized the desire to arbitrate claims that non-probationary employees have been disciplined wrongfully. With this analysis in mind, we consider the particular facts in issue.

*N.D. 8759*

 This grievance involves fifteen of a number of workers engaged in a strike, who refused to return to work and were replaced. The Union contends that they were improperly discharged. The Company's chief argument in opposition to arbitration rests on the refusal of a Regional Director of the National Labor Relations Board to issue a complaint of unfair labor practice regarding the alleged discharge on the grounds that there was insufficient evidence of violation of section 8(a) (1) of the National Labor Relations Act. The Company claims that this refusal constituted a binding determination of the dispute and precludes the Union from seeking relief through arbitration. But apart from the fact that the legal issues before the Regional Director and

an arbitrator are different, see Luckenbach Overseas Corp. v. Curran, 398 F. 2d 403, 405–406 (2d Cir. 1968); United Steelworkers v. American Int'l Aluminum Corp., 334 F.2d 147, 152–153 (5th Cir. 1964), cert. denied, 379 U.S. 991, 85 S.Ct. 702, 13 L.Ed.2d 611 (1965), the proceeding before the Board was administrative only, neither formally adversarial nor like a trial. As such, it has no collateral estoppel effect. Cf. IUE, Radio and Mach. Workers A.F.L.-C.I.O. v. General Electric Co., 332 F.2d 485, 492 (2d Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964); NLRB v. Baltimore Transit Co., 140 F.2d 51, 54–55 (4th Cir.), cert. denied, 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084 (1944); Glass Bottle Blowers Ass'n of United States and Canada, A.F.L.–C.I.O. v. Arkansas Glass Container Corp., 183 F.Supp. 829, 831 (E.D.Ark.1960). The Company also claims that no discharge is involved because the strikers voluntarily chose not to return after the Company lawfully advised them that they would be replaced. However, whether the Company's action was (1) a "discharge" (2) imposed as discipline (3) without just cause are factual or legal issues, or both, which the parties have agreed to let the arbitrator decide. Consequently, we hold that grievance 8759 was correctly found arbitrable by the court below.

*N.D. 8290*

As the attached opinion of my colleagues indicates, we differ as to the disposition of this grievance. The following discussion of N.D. 8290, therefore, represents the views of the writer of this opinion.

On November 25, 1963, the Company's Schenectady plant announced that it

17. E. g., section 4(a) provides:

In the event the receiving party has asserted that the dispute contained in a request for arbitration is not arbitrable, the Association shall have authority to process the request for arbitration and appoint an arbitrator in accordance with the procedure set forth in Section 3 above only after a final judgment of a Court has determined that the griev-

ance upon which arbitration has been requested raises arbitrable issues and has directed arbitration of such issues. *The foregoing part of this Section shall not be applicable if the request for arbitration involves only relief from a disciplinary penalty or discharge alleged to have been imposed without just cause.* [Emphasis added.]

would give its employees an extra-contractual holiday between the hours of 11:30 A.M. and 2:00 P.M. to permit observance of President John F. Kennedy's funeral. The Company stated that the employees would be paid for these hours, on the condition that they return to work at 2:00 P.M. Employees who did not so return were paid only for the hours actually worked that day. The Union claims that the Company's refusal to pay the non-returning employees was punishment for an infraction of a rule which the Company had unilaterally and improperly imposed. Therefore, the Union contends that this refusal was "disciplinary action" under section 6(a) (i). The Company argues that its nonpayment for hours not worked can in no sense be regarded as "disciplinary" and is not covered by that section. The Company claims that if merely calling company action "disciplinary" is enough to require arbitration, then all of the contractual restrictions on arbitration could be unjustifiably nullified.

The problem is a difficult one, for underlying it is the question of good faith, not confined to insincere use of the label "discipline." For example, in Part II of this opinion, we considered grievances based on the command of Article VI, section 4(b), that there "be no change in a standard price except where there is a change in manufacturing method." Even if the Union should claim that a changed rate is Standard in the face of very strong evidence to the contrary, under the controlling authorities we may not ordinarily determine that factual issue.[18] On the other hand, if the Union should claim that a change in the number of a room in which a machine is located is "a change in manufacturing method," there is an obvious difference. In the former case, the substantive commitment on which the Union relies is clear in the contract, and the dispute is primarily factual. In the latter, the fact of change of room number is undisputed; the issue is construction of the contract phrase "manufacturing method." I accept the Company's proposition that under this Agreement mere invocation of a contract clause does not preclude judicial examination of the claim of arbitrability; this was the obvious assumption in our holding grievances N.D. 8427 and N.D. 8643 non-arbitrable, supra. There, we relied on the silence of the contract as to the substantive right claimed combined with the requirements of the arbitration clause that there be an express, not implied, contractual obligation. But where the issue is clearly one of construction of a specific substantive commitment, as in the hypothetical last given, we move on to more treacherous ground. In *American Mfg. Co.*, supra, we are told that "questions of contract interpretation" are for the arbitrator and that "[t]he processing of even frivolous claims" is worthwhile. 363 U.S. at 568, 80 S.Ct. at 1346. But the concurring opinion of Mr. Justice Brennan in that case, joined in by two other justices,[19] emphasized that the arbitration clause itself must always be construed since "the arbitration promise is itself a contract." 363 U.S at 570, 80 S.Ct. at 1364.

The issues before us in this grievance do include construction of the arbitration clause because we must construe the term "disciplinary action" as used in section 6(a) (i). To some extent the grievance resembles N.D. 8759, just discussed, since the parties again disagree as to whether the Company's action was "disciplinary." However, the issue of arbitrability was simpler in N.D. 8759 since a discharge (if that is what took place, as the Union claims) is frequently a disciplinary action. On the other hand, payment for hours not worked is more often cast in terms of eligibility, as the Company contends;

18. But see note 12 supra.

19. Mr. Justice Harlan concurred and Mr. Justice Frankfurter stated that he "joins these observations." 363 U.S. at 573, 80 S.Ct. 1343.

e. g., only those who have worked specified periods are paid vacation pay, holiday pay, etc. Yet, loss of pay may sometimes be regarded as disciplinary.[20] Indeed, the motive and manner of enforcing a "rule" may be significant, and that—on this record—would seem to be in dispute. I do not suggest that the Union could compel arbitration of any conceivable grievance merely by labelling it "disciplinary."[21] The court must be satisfied that the actions in question could possibly be so construed within a rational application of the phrase.[22] But I do not regard as plainly unreasonable the suggestion that what occurred here was disciplinary even though the Union's case on the merits appears weak and its pressure to arbitrate unwise.[23] Therefore, since the Agreement itself—rather than any externally imposed presumption—indicates a preference for arbitrability of such claims, I would hold with the district court that an arbitrator should decide whether the Company (1) imposed discipline (2) without just cause.

## IV

*N.D. 7309*

This grievance arises under Article VI, section 5(c) (4) of the 1960 Agreement between the Company and the Union:

> The Company will, to the extent practical, give first consideration for job openings and upgrading to present employees when employees with the necessary qualifications are available. In upgrading employees to higher rated jobs, the Company will take into consideration as an important factor, the relative length of continuous service of the employees who it finds are qualified for such upgrading.

■ A toolmaker employed by the Company applied for one of two open positions as a diemaker, a job at the same rate of pay. The positions were given to employees with less seniority. The Company contends that seniority is relevant only in upgrading and that "upgrading" refers only to jobs at higher rates of pay. The Union responds that a diemaker has certain advantages over a toolmaker, such as displacement rights, and that "upgrading" includes these benefits as well as wage raises. The district court found the Union's argument "a rather weak reed upon which to rely," but held that the claim did involve the "interpretation or application of a provision of this Agreement" under former Article XV, section 1(a). Since, as has been noted above, the 1960 Agreement contains a "standard" type of arbitration clause, the *Steelworkers* presumptions of arbitrability apply in full force.

20. See, e. g., H. Roberts, Roberts' Dictionary of Industrial Relations 79 (1966): "Discipline may take the form of loss of rights under the agreement, being sent home for a period of time, loss of pay, or other penalties set out in the contract or agreed to as a method of avoiding or reducing the incidence of infractions."
It might be noted that quite a considerable volume of grievances arose nationally on various grounds involving holidays granted for observance of the late President Kennedy's funeral. See, e. g., Neptune World-Wide Moving, Inc., 64–2 CCH Lab.Arb. ¶ 8490; Thomas Wilson Lace Co., id. ¶ 8722; Revlon Corp., id. ¶ 8803.

21. Cf. Communications Workers v. New York Tel. Co., 327 F.2d 94 (2d Cir. 1964).

22. See John Wiley & Sons v. Livingston, 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964):
Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts. It is sufficient for present purposes that the demands *are not so plainly unreasonable* that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction. See *Warrior & Gulf, supra,* at 582–583. [80 S.Ct. 1347]. [Emphasis added.]

23. The Union's attitude will hardly encourage the Company to grant time off with pay in the future, when it is under no contractual obligation to do so.

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. * * *

The courts, therefore, have no business weighing the merits of the grievance * * * or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

*American Mfg. Co.*, 363 U.S. at 567–568, 80 S.Ct. at 1346. Cf. International Longshoremen's Ass'n v. New York Shipping Ass'n, 403 F.2d 807 (2d Cir. 1968). The claim here, regardless of its merits, is on its face governed by the language of section 5(c) (4). We affirm the district court's submission of the grievance to arbitration.

To sum up: We affirm the order directing arbitration as to grievances N.D. 9280, N.D. 9349, N.D. 8759 and N.D. 7309, and reverse as to N.D. 8427, N.D. 8643 and N.D. 8290, with the writer of this opinion dissenting as to the last-named grievance.

MOORE and FRIENDLY, Circuit Judges:

We follow with admiration our brother FEINBERG'S efforts to thread a way through this labyrinthine contract with the single exception of N.D. 8290. There, even granting that words have an accordion-like quality and pushing the accordion to its furthest reach, we are unable to comprehend how a proposal to pay for time not worked can become disciplinary action because it was conditional on prompt return to work. The judgment directing arbitration with respect to N.D. 8290 is therefore reversed.