**CBS INC., Plaintiff-Appellant,**

v.

**INTERNATIONAL PHOTOGRAPHERS OF the MOTION PICTURE INDUSTRIES, LOCAL 644, I.A.T.S.E., Defendant-Appellee.**

**No. 973, Docket 79–7140.**

United States Court of Appeals,
Second Circuit.

Argued May 4, 1979.

Decided Aug. 14, 1979.

---

Robert I. Gosseen, New York City (Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, Emanuel Dannett, Jay C. Cooke, New York City, of counsel), for plaintiff-appellant.

Richard M. Greenspan, New York City, Charles R. Katz, P.C., New York City, for defendant-appellee.

Before LUMBARD and MULLIGAN, Circuit Judges, and SIFTON, District Judge.*

PER CURIAM:

The order entered in the Southern District of New York, Hon. Constance B. Motley, Judge, denying the motion of CBS for a stay of an arbitration proceeding demanded by the International Photographers of the Motion Picture Industries, Local 644, I.A.T. S.E. (the Union), and granting the Union's cross-motion to compel arbitration, is affirmed substantially for the reasons set forth in the memorandum opinion below. 77 Civ. 3916 (S.D.N.Y. Jan. 25, 1979).

While we may agree with Judge Lumbard that the history of the negotiation of the collective bargaining agreement in question supports the conclusion that the employee terminations are "layoffs" and not "discharges", we believe that this is a matter which in the first instance must be resolved by the arbitrator and not the court.

It is well established that federal labor policy favors "arbitration as the means of resolving disputes over the meaning and effect of collective-bargaining

---

* Of the Eastern District of New York, sitting by designation.

agreements." *Nolde Brothers, Inc. v. Confectionery Workers Union Local 358,* 430 U.S. 243, 254, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977). Whether the terminations in issue are arbitrable discharges under the parties' collective bargaining agreement is an issue to be determined in arbitration so long as we are satisfied that CBS' actions could possibly be construed as discharges "within a rational application of the phrase." *International Union of Electrical, Radio and Machine Workers v. General Electric Co.,* 407 F.2d 253, 266 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969).

■ The ordinary meanings of the terms discharge and layoff have long been recognized by the courts. A discharge normally means the "termination of the employment relationship or loss of a position." *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 286, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230 (1946). A layoff, on the other hand, is ordinarily a "period of temporary dismissal"; inherent in the term is the anticipation of recall. Id. at 287 n.11 & 286–87, 66 S.Ct. 1105; accord, *Lord Manufacturing Co. v. Nemenz,* 65 F.Supp. 711, 723 (W.D.Pa.1946); see *Acme Industrial Co.,* 227 N.L.R.B. 249 (1976).

■ In support of its argument that the terminations in question were discharges rather than layoffs the Union asserts that nowhere in the termination notices is the word layoff used, nor do the notices allude to any possibility of employee recall. Indeed, the language of the notices suggests that the severance of employment with CBS was permanent; for example, the notices state that CBS will try to "relocate" the terminated employees in the newsfilm business. Moreover, evidence was introduced in the district court that subsequent to the terminations CBS hired freelance cameramen to perform the same type of work formerly handled by the terminated employees even though no offer of even a limited recall had been made to those employees. In light of these circumstances and the long accepted judicial understanding of the words discharge and layoff,

we find that the instant terminations could possibly be construed as discharges within the rational application of that term. That ends our inquiry; whether the dismissals should rather be deemed nonarbitrable lay-offs is for the arbitrator to decide.

Affirmed.

LUMBARD, Circuit Judge (dissenting):

Since I believe their analysis overlooks material facts, I dissent from my brothers' conclusion that the lay-offs in this case may reasonably be said to fall within the scope of the parties' arbitration clause.

The dispute in this case dates from the spring of 1977, when CBS notified four of its film cameramen that their jobs were to be eliminated as a result of the network's conversion from film cameras to electronic minicams. Typical of the notices was the one sent to cameraman Bruce Hoertel:

> It is my duty to formally notify you of something I believe you know was in the wind; because of the CBS News conversion to electronic camera coverage, your staff employment with CBS News will end on July 23, 1977.
>
> We recognize your years of service and contribution to CBS News and will do whatever we can to help you relocate in the newsfilm business.
>
> Your double severance pay plus any vacation time still due you will be processed promptly for payment. Frank Fitzpatrick is available to you for any clarification or help necessary in the details of this procedure.

Three of the cameramen who received termination notices filed grievances with the Union, and the Union subsequently demanded that CBS reinstate them. When the network refused, the Union attempted to submit the matter to arbitration, and CBS brought this action to enjoin arbitration.

The parties' collective bargaining agreement has no general arbitration clause, but provides in paragraph 21 that disputes involving a "discharge or suspension" will be submitted to arbitration, with the arbitra-

tor to determine only whether CBS' action was arbitrary or capricious. The Union has argued that the three film cameramen were discharged or suspended within the meaning of paragraph 21 and that arbitration is accordingly proper. CBS responds that the cameramen were "laid-off," not discharged or suspended, and that the parties, anticipating that lay-offs would follow the network's conversion to electronic minicams, made special provision, not including arbitration, for employees who lost their jobs for this reason.

The search for the parties' intent in this matter must, of course, begin with the specific language of the arbitration clause contained in paragraph 21. Not surprisingly, however, the phrase "discharge or suspension," considered by itself, could be interpreted as covering or not covering the network's action. Focusing solely on the fact that the four cameramen have, at least temporarily, lost their positions, it could be said that they were discharged or suspended. At the same time, since a discharge or suspension generally reflects an assessment of the employee's competence or behavior, the terminology of lay-off describes more aptly the situation of the four cameramen, who were released not because of unsatisfactory performance but rather because their jobs were no longer necessary.

Faced with this initial ambiguity in the collective bargaining agreement, the majority directs the parties to arbitration without considering even undisputed facts concerning the circumstances of the agreement's formation. I do not believe the presumption favoring arbitrability requires so methodical an approach to contract interpretation, at least where the parties have attempted to narrow the range of arbitrable disputes by adopting a limited rather than broad arbitration clause. The majority's approach is particularly troublesome in the instant case, since I believe the ambiguity in the parties agreement dissolves when the circumstances of their collective bargaining are taken into account.

As CBS has pointed out, the consequences of the network's prospective conversion to electronic minicams was a matter of particular concern during negotiations over the parties' contract. Both CBS and the Union were aware that this technological development would reduce the number of film cameramen needed by the network. To protect any of its members laid-off for this reason, the Union initially demanded that the network give six months notice of such lay-offs, provide double severance pay to those laid-off and give preference to laid-off employees for other employment with the network. The end result of the parties' negotiations was a side letter agreement that CBS give at least four weeks notice of lay-offs, eight weeks to employees with more than five years seniority, and attempt, on a best efforts basis, to find other employment within the network for those laid-off. According to CBS, it was also agreed that double severance pay would be given to laid-off cameramen with a certain level of seniority. Although no written expression of this agreement has been presented, the Union has not denied its existence and concedes that double severance pay was in fact given.

At no point in the negotiations does it appear that the parties shifted their attention from the issue of compensation for victims of the anticipated lay-offs to the question of whether CBS' power to order such lay-offs ought to be limited. Certainly if the parties did intend to limit the network's authority in this area, the arbitration clause, establishing review under an arbitrary and capricious standard, was an improbable expression of their purpose. CBS' discretion as to which employees were to be laid-off was already substantially limited by the standard labor contract provision that lay-offs and rehiring proceed in order of seniority. The primary decision subject to the arbitrator's review would thus have been the network's determination that some film cameramen positions were no longer necessary to its operations, a type of judgment for which review under an arbitrary and capricious standard would make little, if any, sense.

The only reason identified by the majority as supporting a conclusion that the instant dispute falls within the parties "discharge and suspension" arbitration clause is that the four cameramen's loss of employment was likely permanent rather than temporary. According to the majority, this fact suggests that the cameramen were not laid-off but discharged since a lay-off "is ordinarily a 'period of *temporary* dismissal.'" (emphasis added). But whatever the ordinary meaning of the term lay-off, there can be no question that the parties in this case intended it to embrace the situation of cameramen who are permanently released because of the network's conversion to electronic cameras. The clearest evidence of this is contained in the side letter to the parties collective bargaining agreement that obligates CBS to give extra notice to and seek other employment for cameramen who lose their jobs because of the introduction of minicams. The relocation provisions of that agreement obviously contemplate a permanent loss of employment, and yet the agreement employs the terminology not of discharge but of lay-off. Indeed, if the majority's construction of the term layoff is to be taken seriously, CBS is presumably now free to argue that its agreement to give extra notice and to attempt to relocate laid-off cameramen applies only to those cameramen whose release is temporary, not to those cameramen, even though they are in greater need, whose loss of employment is permanent.

In sum, I believe a consideration of the parties' collective bargaining agreement and the circumstances of its formation makes clear that the instant dispute is not arbitrable. Courts do no service to the national policy favoring arbitration by ignoring clear evidence of the parties' intention that disputes of a particular character not be submitted to arbitration.