**LOCAL UNION 1302, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA and Metal Trades Council of New London County, Plaintiffs,**

v.

**ELECTRIC BOAT DIVISION, GENERAL DYNAMICS CORPORATION, Defendant.**

Civ. A. No. N–74–62.

United States District Court, D. Connecticut.

March 19, 1982.

Matthew Shafner, O'Brien, Shafner, Garvey & Bartinik, Groton, Conn., for plaintiff.

Henry M. Kelleher, Foley, Hoag & Eliot, Boston, Mass., Marc A. Wallman, Brenner, Susman & Duffy, New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

This action, brought pursuant to 29 U.S.C. § 185, involves a labor dispute between the plaintiff Metal Trades Council ("MTC"), an association composed of various union locals including co-plaintiff Local Union 1302 ("Local 1302"), and defendant employer, Electric Boat Division of General Dynamics Corporation ("EB"). The basic issue is whether there was a breach of the collective bargaining agreement between the parties when the defendant refused to implement a directive of the MTC assigning work with "contamination-container" bags to Local 1302's members.

I

The moving papers indicate that in 1972 the defendant instructed employees of the

STO Department (pipefitters, electricians and machinists' union) to perform work on the so-called "con-con" bags. Plaintiff Local 1302 (carpenters' union) believed that the work should be assigned to its members and therefore submitted the controversy to the MTC for resolution. The MTC, in turn, notified the defendant that a "jurisdictional dispute" existed between two unions in its association, and that MTC had awarded the assignment to Local 1302. When the defendant failed to heed the MTC's directive, the instant litigation ensued.

The plaintiffs claim that the MTC's decision was a legitimate exercise of its authority under the collective bargaining agreement. They rely primarily on Article V of the contract which states in relevant part that "jurisdictional disputes ... with respect to the jurisdiction of occupational titles ... shall be referred to the Metal Trades Council for settlement ...." Article V further provides that the decision of the MTC "shall be absolutely and equally binding upon the Employer, the Metal Trades Council, its affiliated Local Unions, and all employees in the bargaining unit."[1] In addition, the plaintiffs allege there has been a long-standing practice of referring claims disputed by two or more local unions to the MTC for decision. Therefore, the plaintiffs argue, once the MTC resolved the disagreement between the two contending unions for the job assignment on the "con-con" bags, the ruling was final and binding on the defendant.

Defendant rejects the plaintiffs' contention that a "jurisdictional dispute" within the meaning of Article V is involved here.

It maintains that Article V was not intended to limit management's exclusive prerogative to assign work; rather, it submits, Article V was designed to furnish a procedure for determining which affiliated local union would represent those employees assigned by the defendant to a particular job function. In other words, in the context of the facts in this case, the defendant admits that MTC has the power under Article V to order employees working on the "con-con" bags to join Local 1302, but denies that MTC has the authority to alter the defendant's choice of workers for the project.

## II

At this stage of the proceedings, it is not necessary to reach all the underlying issues raised in the pleadings. By agreement of the parties the Court was to resolve the issue of exhaustion of contractual grievance procedures before proceeding to the case on the merits. See *Gangemi v. General Electric Co.*, 532 F.2d 861, 864 (2 Cir. 1976). The Court held a hearing on the question of arbitrability, at which the parties offered evidence of their past bargaining history, and the matter is now ripe for decision.

On the issue of arbitrability, the defendant argues that the broad language of Article VI of the contract, which sets forth grievance and arbitration procedures, requires arbitration of the dispute between the parties, or, at least, of the "interpretation" of Article V. Under Article VI, the parties agreed to arbitrate "differences ... between the Employer and any of its employes or the Union with respect to the

1. Article V states:

The Employer and the Metal Trades Council, together with all the affiliated Local Unions of the Council, agree that in the event any jurisdictional disputes arise with respect to the jurisdiction of occupational titles as listed in Appendix A or any occupational titles added thereto by the Employer such dispute shall be referred to the Metal Trades Council of New London County for settlement in the following manner:

Upon notice by either the Employer or an affiliated Local Union involved in a jurisdictional dispute, the Metal Trades Council will appoint a committee whose responsibility will be to render an interim decision within seven (7) calendar days of receipt of said notice. Such decision shall remain in full force and effect until such time as amended or ratified by the International Union Presidents whose Local Unions are involved in such dispute.

It is further agreed that pending the adjustment of jurisdictional disputes there shall be no stoppage of work and the work in dispute shall continue to be performed as assigned by the Employer. The provisions of this Article shall be absolutely and equally binding upon the Employer, the Metal Trades Council, its affiliated Local Unions, and all employes in the bargaining unit.

effect, interpretation, application or alleged violation of any of the provisions of this agreement . . . ." To counter the defendant's argument, plaintiffs point to the exclusionary language of Section 9, Article VI, which precludes arbitration of "jurisdictional disputes" that are within the framework of Article V.[2] The plaintiffs maintain

**2.** Article VI states:

Section 1.

A. Should differences arise between the Employer and any of its employes or the Union with respect to the effect, interpretation, application or alleged violation of any of the provisions of this agreement, there shall be no suspension of work but an earnest effort shall be made to settle differences promptly in the manner hereinafter outlined.

B. Before any differences, as defined above, are processed through the grievance procedure, the steward, with or without the employe, shall discuss the problem with the immediate supervisor involved and attempt to resolve it. Failing this the grievance procedure shall be utilized, starting with step 1.

Section 2. It is agreed that all grievances shall be dealt with as provided for in this Article:

A. Step 1. The Steward, with or without the employe, shall present the grievance to the immediate Employer representative of the employe involved within the Steward's area of representation.

If the grievance is settled in this step, the Employer representative will retain one copy of the grievance for departmental records, forward one copy to the Labor Relations Section of Industrial Relations and give two copies to the Union, one for Local Union records and one for the Metal Trades Council.

B. Step 2. If the grievance is not satisfactorily adjusted in Step 1 of the grievance procedure within two (2) working days of the original submission of the grievance, it shall be submitted to the Labor Relations Section of the Industrial Relations Department. Such grievances shall be heard by a Grievance Committee composed of not more than three (3) representatives of the Employer and not more than three (3) representatives of the Local Union involved, including the Local Union Chief Steward and/or Business Agent.

The Grievance Committee shall meet each week when necessary, to consider grievances before it for consideration and shall meet until pending grievances are disposed of through settlement or referred to the next step of the grievance procedure. The aggrieved employe and his immediate supervisor shall be available to the committee for the purpose of testifying on the facts of an individual grievance. When the committee feels such testimony has clearly established the facts of the situation, the employe and his supervisor will be excused and the committee will make its final determination regarding the grievance.

C. Step 3. If the grievance is not satisfactorily adjusted in Step 2 of the grievance procedure within five (5) working days of submittal to the Labor Relations Section of the Industrial Relations Department, it shall be submitted to a committee composed of five (5) representatives of the Metal Trades Council appointed by the President of the Metal Trades Council and five (5) representatives of the Employer appointed by the Manager of Labor Relations. The aggrieved employe and his immediate supervisor shall be available to the committee for the purpose of testifying on the facts of an individual grievance. When the committee feels such testimony has clearly established the facts of the situation, the employe and his supervisor will be excused and the committee will make its final determination regarding the grievance.

D. Step 4. In the event the grievance is not satisfactorily adjusted within five (5) working days from submittal to Step 3, it may be referred to arbitration.

Thereupon, an arbitrator shall be selected by mutual agreement of the parties; however, if the parties are unable to agree upon an arbitrator, it is agreed that they will request a panel of seven (7) arbitrators from the American Arbitration Association.

Upon receipt of a panel of seven (7) arbitrators, the Union and the Employer shall alternately strike one name from the list (the right to strike the first name having been determined by lot) until only one (1) name remains and that person shall be the arbitrator.

The arbitrator shall be without power to change, alter or amend the language of this Agreement. The fees and expenses of the arbitrator shall be shared equally by the parties and the decision of the arbitrator shall be final and binding on the parties.

Upon written notice from the Metal Trades Council to arbitrate the grievance in question, the Employer and the Union (or an affiliated Local Union if authorized by the Metal Trades Council) shall, within five (5) days of such notice, select and notify the arbitrator of his selection and in addition, request a date to arbitrate.

E. It is agreed that no Local Union grievance shall be referred to arbitration without the approval of the Metal Trades Council in writing.

F. Should the Metal Trades Council give written permission to arbitrate a dispute to one Local of the Union, the Metal Trades Council will also be bound by the decision of the arbitrator.

Section 3. All grievances must be presented in writing within twenty (20) working days from the date of knowledge of the occurrence or knowledge of the failure of occurrence,

that Section 9 was intended not only to make the MTC the final arbiter of jurisdictional disputes but also to allow MTC to define jurisdictional disputes under Article V.

## III

At the outset, certain basic principles enunciated in the leading cases must be recognized. In *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), one of three cases often referred to collectively as the *Steelworkers Trilogy*, the Supreme Court set forth the applicable standard for resolution of questions concerning the arbitrability of collective bargaining disputes:

> [A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance .... An order to arbitrate ... should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. (footnote omitted) (emphasis added).

whichever may be the case, of the incident upon which the grievance is based.

Section 4. Grievances "general in nature" involving interpretation and application of the provisions of this agreement shall be initiated and signed by Chief Stewards and/or Business Agents of a Local Union or the President of the Metal Trades Council and submitted to the Labor Relations office in Step 3 of the grievance procedure.

Section 5. The settlement of any grievance involving wage adjustments shall be retroactive to the nearest pay day it is agreed that the adjustment should have been made.

Section 6. Any grievance arising from discharges, suspensions or layoff will be given priority over other grievances, in the order named.

See also *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co.*, 406 F.2d 1046, 1048 (2 Cir. 1969).

Later case authority has refined to a degree the pronouncement of the *Steelworkers Trilogy* with respect to "exclusionary clauses." In keeping with the general philosophy of federal labor policy favoring arbitration as the means of resolving disputes arising from collective bargaining agreements, courts have consistently held that where an agreement contains a clause purporting to exclude certain disputes from a general arbitration provision, that clause must be "clear and unambiguous" or "unmistakably clear" to except the dispute.

In *Wire Service Guild v. United Press International, Inc.*, 623 F.2d 257, 260 (2 Cir. 1980), the Court was confronted with a "broadly phrased" arbitration clause similar to the one in the case at bar. The clause there provided that "any grievance as to the interpretation or application of this Agreement ... shall be submitted to arbitration ...." The provision, however, excluded from mandatory arbitration "any issue bearing on the Employer's sole responsibility to determine the size and composition of its staff." Still another clause of the agreement limited dismissals to those for "just and sufficient cause," adding that "[r]eduction in staff shall constitute just and sufficient cause." The plaintiff, who had been terminated after refusing to transfer, raised a question which required interpretation of the "reduction in staff"

Section 7. Employes participating in the settlement of grievances during their normal working hours as provided in this Article shall be paid at their working rate of pay by the Employer, except in the arbitration step of the procedure.

Section 8. It is agreed that time limits defined in this Article may be extended by mutual agreement.

Section 9. It is further agreed that jurisdictional disputes are not a subject for the grievance or arbitration procedure as defined in this Article but will be settled in accordance with the procedure as set forth in Article V Jurisdictional Disputes.

language. The Second Circuit held that under the broad provisions of the arbitration clause, the matter of interpretation was for the arbitrator because the exclusionary language did not "unambiguously and unmistakably preclude arbitration" of that question. *Id.* at 260.

Similarly, in *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. General Electric Co.,* supra, 406 F.2d at 1048, a union contract contained an arbitration clause which provided in part that working hours would be subject to arbitration "except as to issues involving the Company's right to schedule shutdowns." After the company announced that it would suspend production at one of its plants, the Union filed a petition to compel arbitration. The company and Union disagreed as to whether "shutdown" as used in the agreement included a suspension. The Court held the dispute arbitrable because it could not say "with the required 'positive assurance' that the arbitration clause is not 'susceptible' of the Union's interpretation." *Id.* at 1048. See also *Central States, Southeast and Southwest Areas Pension Fund v. Howard Martin Inc.,* 625 F.2d 171, 172 (7 Cir. 1980); *CBS Inc. v. International Photographers of the Motion Picture Industries, Local 644,* 603 F.2d 1061, 1062–63 (2 Cir. 1979); *Carpenters District Council of Denver and Vicinity v. Brady Corporation,* 513 F.2d 1, 2–4 (10 Cir. 1975) (agreement involving jurisdictional dispute); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. General Electric Company,* supra, 406 F.2d at 1048.

Applying these standards to the facts in the instant case, it is the opinion of the Court that the exclusionary language of Section 9 is not sufficiently clear and unambiguous to permit the dispute between the parties concerning Article V to escape arbitration. While it is true that the MTC has authority to resolve all jurisdictional disputes, the term "jurisdictional disputes" is susceptible to different interpretations. At least two reasonable possibilities exist. In the context of this case, it may include, as the plaintiffs claim, a dispute involving worker placement, or, as the defendant argues, simply refer to the designation of the proper affiliated union. See generally *Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 263, 84 S.Ct. 401, 404, 10 L.Ed.2d 10 (1964). Resolution of this question depends on an interpretation of the provisions of the collective bargaining agreement between the parties and, therefore, is a matter which falls within the scope of the arbitration clause.

Moreover, the evidence submitted at the hearing and in moving papers does not save the day for the plaintiffs. The exhibits, demonstrating an uneven treatment of disputes similar to that involved here, only further obfuscate the meaning of Article V. A careful study of the exhibits relating to the grievance history between the parties suggests, on the one hand, that Article V directives may not possess the finality which the MTC accords them and, on the other hand, that the defendant's course of conduct in the past has been inconsistent with its present position.

The affidavits provide even less guidance for the Court than does the checkered grievance history set forth in the exhibits. For example, Charles A. Petchark, the prior Recording Secretary of MTC and a negotiator of the bargaining agreement involved here, has stated that "[i]t was not the intent of the parties that Article V could be used by the MTC to limit or remove EB's right to assign work, but rather that Article V would provide a method of resolving intra-union, i.e., intra MTC, representational questions." Affidavit of Charles A. Petchark, May 13, 1974. Mr. Petchark's successor, Joseph W. Messier, states flatly that "Mr. Petchark's contentions as to the historical background and historical experience as to Article V do not conform with the records and experience of labor-management relations at Electric Boat or of the MTC." Affidavit of Joseph W. Messier, May 20, 1974.

Under these circumstances, it seems evident to the Court that it must not "become entangled in the construction of the substantive provisions of a labor agreement,

even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, supra, 363 U.S. at 585, 80 S.Ct. at 1354. See also *CBS Inc. v. International Photographers of the Motion Picture Industries, Local 644*, supra 603 F.2d at 1062; *Ottley v. Palm Tree Nursing Home*, 493 F.Supp. 910 (S.D.N.Y. 1980).

Accordingly, because the plaintiffs have failed to exhaust their contractual remedies prior to institution of suit, this action is dismissed, *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965), without prejudice.