**Clay SHIELDS, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**Civ. A. No. 6089.**

United States District Court,
W. D. Kentucky,
Louisville Division.

Jan. 5, 1970.

Manny H. Frockt, Louisville, Ky., for plaintiff.

Galen J. White, Jr., Bullitt, Dawson & Tarrant, Louisville, Ky., for defendant.

## MEMORANDUM OF DECISION AND ORDER

JAMES F. GORDON, Chief Judge.

This is an action under Section 301 of the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 185, timely removed from the Chancery Division, Jefferson Circuit Court, Jefferson County, Kentucky. After trial without a jury on the merits,[1] this Court concludes that it has jurisdiction over the parties and subject matter and holds that plaintiff's claim should be dismissed, based upon the following findings and conclusions.

Plaintiff, Clay Shields, is a member of Local 761, International Union of Electrical, Radio and Machine Workers (hereafter "Local 761" or "International Union," when appropriate), and is an employee of defendant, General Electric Company, at Appliance Park, Jefferson County, Kentucky. Defendant, a New York corporation lawfully doing business in Kentucky, is an "employer" within the meaning of Section 2(2) of the Labor Act. 29 U.S.C. § 152.

Plaintiff alleged in his second amended complaint and offered proof at trial that defendant had breached the National Agreement between defendant and the International Union, in effect from October 3, 1966 to October 2, 1969, when defendant, in April, 1968, unilaterally reduced the incentive earnings potential of employees, including plaintiff, in defendant's wire condenser section located in Building 4 at Appliance Park, from 125% of each employee's hourly rate to 120%. These employees are paid on the basis of the output of condensers by welding machines in the section, each condenser being assigned a separate piece rate price.

Plaintiff was employed in the wire condenser section from 1960 to May, 1969. Until 1967 the section contained three large welding machines known as the Louisville, Federal and Erie welders. Each welder produced different kinds of condensers for use in the manufacture of refrigerators.

In early 1962 the piece rate price on each condenser was raised by defendant so that the incentive earnings potential

1. Although representatives of Local 761 and the International Union called in behalf of plaintiff testified that defendant had "traditionally" refused to arbitrate issues similar to that involved in this action, none contended the issue herein is arbitrable as a matter of right under the most recent National Agreement.

of employees in the section was increased from between 108% and 112% to 125% of their base hourly wages. This increase was accomplished by reducing the number of wire condensers that had to be produced an hour to enable the employees to earn their base hourly rates before incentive earnings began.

In early 1967 the Erie welder was replaced by the new Schenectady welder which had the capacity of producing any existing model of condenser manufactured on either the Louisville or the Federal. In October, 1967, the section's employees were notified by defendant that in February, 1968, the incentive earnings potential would be reduced from 125% to 120%, by means of a new incentive plan being applied to machine and process control jobs throughout Appliance Park.[2] At the request of Local 761, defendant delayed the reduction until April, 1968, while it thoroughly reviewed the work of the section.

The provisions of the National Agreement at issue are contained in Article VI and state, in pertinent part, as follows:

"4. *Piece Prices—Hourly Rated Piecework Employees*

(a) Piece prices are classified as standard, temporary or special and all piecework vouchers will indicate the classification.

(1) *A Standard Piece Price* is one set where the manufacturing method has become established.

(2) *A Temporary Piece Price* is one set where the manufacturing method is under development or has been changed, or the average pieceworker on the job has not yet attained normal performance.

\*   \*   \*   \*   \*   \*

(b) There will be no change in a standard price except where there is a change in manufacturing method.

\*   \*   \*   \*   \*   \*

(c) Subject to the foregoing, the Company will replace a temporary price with a standard price within six months if reasonably possible under the circumstances."

The Court heard considerable testimony about the meaning and effect of these provisions. Plaintiff claims that the piece rate prices paid on condensers at the time of the reduction were standard prices, which could not be reduced in the absence of a manufacturing methods change. Defendant, on the other hand, offered proof that the prices were temporary and could be reduced or otherwise changed without limitation.[3]

Plaintiff's proof that the piece rate prices in the wire condenser section from at least 1962 to 1968 were standard consisted of testimony by Vann McLaughlin, a shop steward in the section, that he believed they were standard, principally because in his opinion the jobs and the condensers produced in the section had not changed appreciably over the years.

However, Al Watson, unit manager of the section from 1964 to early 1968, and Emil Breitenstein, a wage rate and time study expert for defendant, testified that piece rate prices were temporary throughout the 1960's and at the time of the change in earnings potential in April, 1968. In addition, Breitenstein, called by both plaintiff and defendant, testified in some detail about reviews of the wire condenser section made by defendant's wage rate experts in 1967 and 1968, and that based upon these reviews and his own knowledge of the section, the piece rate prices had continued to be tempo-

2. The testimony in the case was that the wire condenser section was a machine controlled job; that is, the welder had a longer cycle per piece than the time of work elements assigned to any employee in the section, and the employees were paid on the output of the welder rather than on the effort of the employees.

3. The parties agreed that if a price is temporary it can be increased or decreased at defendant's will.

rary and could not be replaced with standard prices. In Breitenstein's opinion, the manufacturing method had not become so established that standard prices could be set on the wire condensers because of, among other things, persistent variables in the manufacturing process and materials, and because of continual changes in the design and configuration of the wire condensers.

In the opinion of this Court, Article VI, Section 4 of the National Agreement creates a duty and a power in defendant to designate temporary or standard price classifications.[4] The Agreement contains no criteria to be applied by defendant other than the definitions of standard and temporary prices and the language of Section 4(c), which states that a temporary price shall be replaced by the Company with a standard price "within six months if reasonably possible under the circumstances."

Under Article VI, Section 4, a standard price does not become established on the basis of some employee's hopes or thoughts; nor does it become established automatically or by time or custom. On the contrary, a standard price is set by defendant under the Agreement where the manufacturing method has become established.

This Court finds that the manufacturing method in the wire condenser section had not become established, and that the prices on the wire condensers at the time plaintiff's earnings potential was changed from 125% to 120% were temporary prices, which could be reduced at defendant's will.

Further, this Court finds that Section 4(c) is only a minimal restriction on defendant's unilateral right to set temporary and standard prices. The language

of Section 4(c) is not ambiguous language necessarily. It is the language of compromise which gives away little. Like the kimono, it covers everything but touches nothing. Thus, when it has been demonstrated that a price is temporary, the sole burden assumed by defendant under Section 4(c) is to show by merely a *scintilla* of evidence that it has reviewed the job. That is its only legal obligation under the Agreement. Once defendant has looked into the job, it is not inhibited in any manner by the Agreement from unilaterally reaching its own conclusions about the price. The "six months" phrase in Section 4(c) is not a controlling time limit on defendant's exercise of its judgment. Based upon the testimony of plaintiff's own witnesses, particularly Mr. Jandreau of the International Union, the stated time period of six months is merely to stimulate defendant· in reviewing and reaching its conclusions about a price.

Plaintiff's counsel argued at length that plaintiff and other employees similarly situated have no redress for this issue save judicial relief. It is the opinion of this Court that if plaintiff, Local 761 or the International Union desire to limit defendant's actions under Section 4 the appropriate forum is the bargaining table—not the forum of the Court. It is not the function of the Court to rewrite collective bargaining agreements, but to interpret those agreements arrived at by the parties.[5]

## ORDER

AND NOW this 2 day of January, 1970, for the foregoing reasons, the complaint and amended complaints of plaintiff shall be, and hereby are dismissed with prejudice, with costs to plaintiff.

This is a final order.

---

4. The Agreement does not require defendant to set incentive prices on any particular jobs, but contains only criteria applicable once incentive prices are established by defendant.

5. The language at issue in the 1966–69 Agreement has been included in national agreements between defendant and the International Union since 1950. In 1969 the International Union proposed that Section 4(c) be changed to read: "Subject to the foregoing, a temporary price will become a standard price within six months." In prior years the International Union sought to eliminate the language: "if reasonably possible under the circumstances." .