**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO–CLC, Appellant.**

v.

**GENERAL ELECTRIC COMPANY,**
Appellee.

**Nos. 65–66, Dockets 71–1247, 71–1288.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 12, 1971.

Decided Nov. 16, 1971.

---

62.  218 F.2d 734 (5th Cir. 1955).

63.  See note 38, *supra*.

64.  418 F.2d 249, 258 (5th Cir. 1969).

65.  See note 38, *supra*.

Robert Friedman, New York City (Irving Abramson, on the brief), for appellant.

David L. Benetar, New York City (Michael I. Bernstein, Stanley Schair, Aranow, Brodsky, Bohlinger, Benetar, Einhorn & Dann, New York City, on the brief), for appellee.

Before FRIENDLY, Chief Judge, CLARK, Associate Justice,* and KAUFMAN, Circuit Judge.

IRVING R. KAUFMAN, Circuit Judge:

The International Union of Electrical, Radio and Machine Workers brought suit in the Southern District of New York pursuant to Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, seeking to compel arbitration of fifty-two grievances under the 1963–1966 and 1966–1969 collective bargaining agreements with General Electric Company.[1] After the parties disposed of thirteen of the grievances by stipulation, Judge Cooper, upon the Union's motion for summary judgment, directed arbitration of thirty-seven grievances and denied arbitration of two, D.C., 322 F. Supp. 911. The Union has appealed from that part of Judge Cooper's order denying arbitration, and General Electric has cross-appealed with respect to nine grievances. We affirm Judge Cooper's order.

In 1968 this Court came to grips with a similar suit between these two parties based primarily on the 1963–1966 collective bargaining agreement. International Union of Electrical, Radio and Machine Workers v. General Electric Co., 407 F.2d 253 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969) ["1968 Case"]. Prior to 1963, the collective bargaining agreement between the Union and General Electric included the typical "standard" arbitration clause, which provided that all disputes involving "the interpretation or application of a provision of this Agreement" were subject to arbitration. See International Union of Electrical, Radio and Machine Workers v. General Electric Co., 332 F.2d 485, 488 (2d Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). This arbitration clause was changed drastically in the wake of three Supreme Court decisions dubbed the *Steelworkers trilogy.* United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The *trilogy* instructed that the national labor policy favors arbitration of all labor disputes and, accordingly, that courts interpreting arbitration clauses of collective bargaining agreements should resolve all doubts in favor of arbitration.[2] The 1963–1966 agreement deliberately sought to avoid the implications of the *trilogy* presumption by sharply and narrowly defining disputes which were to be subject to com-

---

* United States Supreme Court, retired, sitting by designation.

1. The parties conceded below that the provisions of the two agreements which are relevant to this case are identical, and they make no distinction between them.

2. The Court, however, did not disavow that arbitrability is determined as a matter of contractual obligation. See War-

rior & Gulf at 582, 80 S.Ct. 1347. See also Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962): "Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties."

pulsory arbitration.[3] This court was then called upon in the *1968 Case* to apply the new "unusually complex contractual language" to six grievances within the framework of the *trilogy*. *1968 Case* at 255.

Before we examine these contractual provisions and the principles enunciated in the *1968 Case* as they apply to the grievances presented in this appeal, we are constrained to comment on the distressing history of litigation between these parties. We recognize the wisdom of their course when the parties sought a definitive judicial interpretation of their new and radically changed arbitration provisions in light of the *Steelworkers triology*. But, after having received a thorough and incisive interpretation in a painstaking opinion, the parties have returned soon again, now for an interpretation of the arbitration provisions as they relate to yet another set of individual grievances.

We are fully aware that federal courts cannot escape or evade *sua sponte* their statutory duty to referee disputes arising under collective bargaining agreements.[4] Moreover, we know that when appropriate, the availability of the courts is essential to labor peace and the strike-free operation of industry. But by continually and regularly falling back on the courts, these parties have largely abdicated their responsibilities to seek peaceful, voluntary resolution of their own problems and have thus abused the judicial process. We hesitate to consider the consequences if more employers and

unions adopted the stringent contractual arbitration language involved here and then foisted on the federal courts, in these days of congested calendars, the responsibility for directing when and when not to arbitrate each time a dispute concerning one of thousands of employees survived the grievance machinery.

We suspect that the employer and the union may consider Section 301 litigation a necessary dose of medicine every time they fail to agree on arbitrability.[5] In the hope of thwarting any such thoughtless involvement of the federal courts, we want to make clear that we reaffirm the principles of the *1968 Case* and that we shall apply those principles equally to all substantive provisions of the contract.

Since the *1968 Case* describes the arbitration provisions at length, a brief statement of those provisions relevant for our purposes will suffice. Although Article XV, Section 1(a) states that any grievance which involves "the interpretation or application of a provision of this Agreement" may be submitted to arbitration, Article XV, Section 6(a) limits arbitration as a matter of right to disputes (in addition to disciplinary disputes and other disputes not relevant here) which involve "[t]he claimed violation of a specific provision or provisions of the National Agreement." Section 6(b) goes on to provide that "[a] request for arbitration, in order to be subject to arbitration as a matter of right * * * must allege a direct violation of the express purpose of the con-

---

3. *See 1968 Case* at 256; Jones & Smith, The Impact of the Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators, and Parties, 52 Va.L.Rev. 831, 904 n. 181 (1966): "Of all the recently negotiated provisions containing restrictions on the arbitration process and attempts to shore up 'management rights' perhaps the most elaborate and tightly drawn are contained in the General Electric Company-IUE agreement of 1963."

4. Section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a), provides:

    Suits for violation of contracts between an employer and a labor organization

representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

5. Judge Feinberg in the *1968 Case*, 407 F.2d at 258, was moved to comment: When an arbitration clause begins to resemble a trust indenture, one wonders what gain there is for either party in agreeing to arbitrate at all, other than the questionable joys of litigation.

tractual provision in question, rather than of an indirect or implied purpose." [6] Section 7 then enumerates specific types of disputes which are subject only to voluntary arbitration.

The basic holding of the *1968 Case*,[7] as it applied to each dispute presented there, was summarized by Judge Feinberg in one sentence:

> In each case we will ascertain whether the grievance involves a "claimed violation of a specific provision," as defined above, and then determine whether any other provision of the Agreement, not yet discussed, specifically excludes it from arbitration. *1968 Case* at 260.

We proceed to consider each grievance within this framework, but will treat each somewhat summarily as the principles alluded to have been fully developed in the *1968 Case*.

### N.D. 13671—Abnormal or Off-Standard Shifts

■ General Electric instituted "abnormal" or "off-standard" shifts on the annealing furnace operation at its Lynn facilities. Under this schedule an employee was required to work for six consecutive eight-hour days, after which he

received two days off. The Union argues that this work schedule, which requires an employee to work a six-day, forty-eight hour week, violates Article V, Section 1(a) of the agreement.[8] That section, entitled *"Workweek,"* provides:

> The regular working week for both salaried and hourly rated employees shall be 40 hours per week, 8 hours per day, 5-day week, from Monday to Friday inclusive. The workweek on multiple shifts may be less than 40 hours.

The Company in response argues that Article V, entitled "Working Hours: Straight Time—Overtime," relates only to the definition of the regular workweek for purposes of computing overtime pay and does not limit the right of management to assign overtime work. We agree with the district judge that this dispute is not arbitrable.

Judge Cooper determined that the "express purpose of Article V, Section 1(a) appears to be to define the workweek and the workday for over-time purposes" and that any limitation on management's right to assign overtime is an "implied obligation." Although there may be some basis for the Union's contention that the express purpose of Article V is broader than Judge Cooper stated,[9] we

6. A party in its written request for arbitration must "state in reasonable detail the nature of the dispute and the remedy requested and send a copy of the request to the American Arbitration Association." Article XV, Section 2(a). If the other party opposes arbitration on the ground that the dispute submitted is not arbitrable as a matter of right, the American Arbitration Association may process the request "only after a final judgment of a Court has determined that the grievance upon which arbitration has been requested raises arbitrable issues and has directed arbitration of such issues." Article XV, Section 4(a).

7. Article XV, Section 4(b) (v) states that "no court or arbitrator shall or may proceed under any presumption that a request to arbitrate is arbitrable." The *1968 Case* specifically declined to decide "whether 'national labor policy' may be so blithely diluted" because the Court did not rely on any general presumption in deciding the arbitrability of the grievances in ques-

tion. *1968 Case* at 259. We for the same reason also decline to determine the effect of this provision.

8. All disputes which are involved in this case have been processed through all stages of the grievance machinery.

9. There is no question that the primary purpose of Article V is to define the Company's obligation to pay overtime. This is apparent not only from the title of the article, but from a general reading of the nine sections. For example, Section 2 lists the overtime rates the company must pay under different circumstances; Section 8 lists "other special payments"; and Section 9 specifies the "division of overtime." Moreover, in a published arbitration award, James A. Healy, one of the country's leading arbitrators, determined in 1958 that Article V "emerged solely to define the basis for computing overtime." 31 LA 403, 412 (1958). This decision must be considered part of the subsequent bargaining history between the parties.

need not rely simply on Judge Cooper's interpretation of the purpose of the provision in upholding the order denying arbitration. Article XV, Section 6(b), after providing that a request for arbitration to be arbitrable as a matter of right "must allege a direct violation of the express purpose of the contractual provision in question," includes the following example:

> For example, a request which claims incorrect application of the method of computing overtime pay under the provisions of Section 2 of Article V would be arbitrable as a matter of right, *whereas a request which questioned the right of the Company to require the performance of reasonable overtime work, on the claimed ground that Article V contains an implied limitation of that right, would be subject only to voluntary arbitration.* (Emphasis added.)

In short, the parties themselves have clearly evidenced their understanding that a dispute of the type presented in this grievance is not subject to compulsory arbitration.

### N.D. 12972—Seventh Day in Continuous Operations

■ Judge Cooper also decided that the dispute which involved the definition of the "seventh day" in continuous operations was not arbitrable. The contract provides that when an employee is assigned to a shift which is part of an operation conducted twenty-four hours a day, seven days a week, he is entitled to overtime if he is required to work on the "seventh day" of his workweek.[10]

The Company established a special four-shift schedule for continuous operations in the Schenectady wire mill. The schedule included three regular eight-hour shifts, but a fourth employee was required to rotate his hours to fill in for the first three shifts on the off days of the employees assigned to those shifts. As a result, the employee on the fourth shift began by working four days and being off the next three. During the second week the employee worked all seven days; during the third week he was off two days and worked the next five days; and during the fourth week he worked two days, was off two days, and worked the next three days. The Union claims that this employee was required to work on the seventh day of the first week and the seventh day of the third week[11] and should have been paid overtime for those days.

In order to resolve this dispute the arbitrator would have to refer to a definition in the contract of the "seventh day," if he could find one. The "workday" and "workweek" for continuous operations are defined in Article V, Section 3(a) (1):

> When any employee on continuous operations has a scheduled workweek of 5 days at work and 2 days off, his first scheduled day off shall be considered as the 6th day of his workweek, and his second scheduled day off, whether or not successive, as the 7th day of his workweek. When such

---

But the last sentence of the first paragraph of Section 1(a) gives us reason to pause. It says that "[t]he workweek on multiple shifts may be less than 40 hours." Clearly, that sentence has nothing to do with defining overtime. Can it be said that the Company, although it can establish a regular workweek of less than 40 hours, cannot establish one of more than forty hours? This dispute does not involve sporadic overtime, but regular forty-eight hour workweeks.

10. An employee is entitled to time and one-half if the seventh day is a weekday and double time if it is a Saturday, Sun-

day or holiday. Article V, Section 4(a) (5) and Section 4(b) (1).

11. The Union would start the first workweek at the time the employee starts work on the first day of the cycle. Although he works only four days, the employee is required to return to work at a time less than 168 hours (or a full seven days) after he begins the first day of work. The Union also claims that the employee works on his seventh day because he does not get a full forty-eight hours off after he works seven straight days during his second week.

working schedule contains a regularly recurring work week of 6 days at work and one day off, such scheduled day off shall be considered as the 7th day of his workweek and the day immediately preceding as the 6th day of his workweek.

This definition, as Judge Cooper concluded, does not relate to the shift in question here. Instead of recurring seven-day cycles of five days on, two days off or six days on, one day off, we are faced with a twenty-eight-day cycle. Since the Union has not pointed to, and we cannot find, any other provision in the contract which defines the concept of the "seventh day," [12] to resolve this dispute the arbitrator would have to imply or supply a definition of "seventh day" to the contract. Whether we rely on the provision which requires that the party seeking arbitration allege a direct violation of an express provision [13] or the provision which excludes from compulsory arbitration any claim based upon an implied obligation,[14] this dispute can be arbitrated only upon mutual consent of the parties.[15]

### N.D. 11974—Changes in Piece Prices

■ The Company appeals initially from Judge Cooper's order directing arbitration of a dispute involving changes in piece prices. The Union claims that the Company, by changing a "standard" piece price without an accompanying change in manufacturing method, violated Article VI, Section 4(b) of the Agreement, which in pertinent part provides:

> There will be no change in standard price except where there is a change in manufacturing method.

In response, the Company argues that the price changed was not "standard," but "temporary." Standard and temporary piece prices are defined in Article VI, Section 4(a):

(1) *A Standard Piece Price* is one set where the manufacturing method has become established.

(2) *A Temporary Piece Price* is one set where the manufacturing method is under development or has been changed, or the average pieceworker on the job has not yet attained normal performance.

In spite of the extensive efforts of the Company to distinguish the *1968 Case*, this grievance does not differ from grievances N.D. 8427 and 8642, discussed in that case and held arbitrable. *1968 Case* at 261–263. Stated summarily, this grievance involves a two-step factual determination, each step within an express provision of the agreement. First, was the price before the change "standard" or "temporary" within the meaning of Section 4(a)? And second, if the price was standard, was the change in price accompanied by a change in manufacturing method? If the arbitrator determines that the Company has violated Section 4(b), he may order the old price reinstated.[16]

---

12. The only other provision in the contract which defines "workday" or "workweek," Article V, Section 1(a), is expressly made inapplicable to continuous operations.

13. Article XV, Section 6(b). The union argues that all that is in issue is a factual question and that the *1968 Case* requires all factual questions to be resolved by the arbitrator. The Union, however, misreads the *1968 Case*, which held that factual disputes were to be decided by the arbitrator only if resolution depended upon the interpretation of a specific, express contract term. *1968 Case* at 259.

14. Article XV, Section 7(c).

15. If the parties do not agree on arbitration, definition of the seventh day in continuous operations which do not fall within Article V, Section 3(a) (1) remains a management prerogative. *See* Article XV, Section 4(b) (iv).

16. The Company argues, as it did in the *1968 Case*, that the arbitrator would violate Article XV, Section 7(e) by reinstating the old price. That section excludes from compulsory arbitration all disputes which would require an arbitrator "to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employee shall be paid * * *." The *1968 Case* determined that "the arbitrator is not called upon to evaluate what an 'appropriate' rate should be, but to determine whether the present rate was established by the Company in violation of

The Company would have us conclude that the dispute is not arbitrable because the Union has not alleged that the Company had "designated" the price in question as "standard." Thus, it argues, the dispute cannot come within Section 4(a) (1) because no standard price has been "set."[17] But, the how and when of the price setting are questions of interpretation of contractual provisions and must be decided in the first instance by the arbitrator. *See* Enterprise Wheel & Car Corp., *supra,* at 599, 80 S.Ct. 1358.

*N.D. 10269, 11397 and 17703—Changes in Manufacturing Method*

■ Grievances N.D. 10269, 11397 and 17703 also concern Article VI, Section 4(b). That section *in full* provides:

There will be no change in a standard price except where there is a change in manufacturing method.

Where such a change in manufacturing method is made, the price may be adjusted. However, such adjustment shall be limited to those parts of the job affected by the change.

In order that the operator will be able to make the same hourly earnings under a new price where a change in manufacturing method is made which does not reduce the job value on which the original price was computed, the adjusted price will be in direct proportion to the change in allowed time for the part of the job affected by the new method. When a price is reduced

on such jobs, the employee and his representative will be given at least one week's notice that the price is to be changed.

The Union charges that price changes on three jobs "exceed" the manufacturing changes and, in any event, are not "in direct proportion" to the change in allowed time. The Company admits changes in standard prices, but contends that the changes are so extensive that the new operations constitute "new jobs."

It is clear to us that the factual dispute—whether the company created new jobs[18] or whether some facets of old jobs were retained despite the extensive method changes—is arbitrable,[19] as the district judge determined. The problem arises, however, over the scope of arbitration. Judge Cooper held that the issue for arbitration "is whether the Company's actions in respect to these grievances constituted a violation of Article VI, Section 4(b)." But, posing the question in that form appears too restrictive. The real dispute between the parties concerns the power of the arbitrator to change the prices instituted by the Company. What is the arbitrator to do if he determines that the Company's price changes were not limited to those parts of the job affected by the change in manufacturing method?

It cannot be questioned that the arbitrator can reinstate the old price on those parts of the job unaffected by the change in manufacturing method. Since the Company is required to retain the old price on those parts by the first

its agreement." *1968 Case* at 262. Since the Company has bound itself under the agreement to retain the old rate, the arbitrator in reinstating that rate does not usurp management prerogative or discretion.

17. The Company relies on Shields v. General Electric Co., 319 F.Supp. 606 (W.D. Ky.1970), where the court dismissed an action brought by an individual employee under Section 301 alleging a similar violation of Article VI, Section 4. In particular, the Company points to the court's comment that "a standard price does not become established on the basis of some

employee's hopes or thoughts; nor does it become established automatically or by time or custom." *Id.* at 609. In the next breath, however, the court found that the manufacturing method had not become established. Thus, the case, even if it were controlling, does not bear on price setting when the manufacturing method has become established.

18. The agreement does not define or refer to "new jobs."

19. The Company previously offered to submit to arbitration the limited issue "whether each of the operations in fact constituted a 'new job.'"

paragraph of Section 4(b), the arbitrator would not be in violation of Article XV, Section 7(e), which bars him from "setting" prices.[20] The considerations involved in this determination seem indistinguishable from those involved in N.D. 11974 already discussed and N.D. 9280 and 9349 in the *1968 Case.*

The same rationale also leads us to conclude that the arbitrator has jurisdiction over prices established in accordance with manufacturing changes. In the third paragraph of Section 4(b) the Company has relinquished its discretion over these prices. To illustrate, if the Company employed a one-step operation which took ten minutes to complete and the employee was paid fifty cents for completing that step, a new manufacturing method instituted by the Company which reduced the time required to complete that operation to five minutes would require the Company to set a price of twenty-five cents. Since the arbitrator has the power to determine whether the price reduction violated the agreement, *a fortiori,* he may determine the proper price required by the agreement. He is not acting contrary to Article XV, Section 7(e) in such an instance, because he will not be "evaluating" rates, exercising any discretion or infringing on management prerogatives; rather, after he has determined the "change in allowed time," a factual question under the agreement, he will mechanically apply the contract pricing formula.[21]

*N.D. 12106, 13256, 13257 and 13259— Job Transfers*

█ In considering the next four grievances appealed by the Company, we turn to Article X, Sections 2(a) (2–3):

2. *Hourly Rated Daywork Employees*

(a) An hourly rate employee on daywork when permanently transferred

\* \* \* \* \* \*

(2) to a related daywork job having a higher job rate will be paid a rate not less than two steps below the job rate of the job to which he is transferred, and will thereafter progress to the job rate in not more than six months.

(3) through upgrading, to a daywork job having a higher job rate will be transferred at not less than his rate immediately prior to transfer and will be paid the job rate of the new job for normal performance.

Concerning three of the grievances, the Union alleges that four employees were transferred to related daywork jobs,[22] but were paid at a rate more than two steps below the established rate for the new job.[23] In the fourth grievance the Union charges that an employee promoted from assistant boilerhouse operator to boilerhouse operator was capable of "normal performance" and should have been paid at his new job rate.

It is clear to us, as it was to the district judge, that these grievances constitute factual disputes under specific provisions of the agreement. The arbitrator will be called upon to decide whether each of the employees covered by the first three grievances was transferred to a "related daywork job" and whether the employee promoted to boilerhouse operator was capable of "normal perform-

20. *See* note 16 *supra.*

21. *Id.*

22. Article X, Section 2(b) defines "related daywork job" as "a job having requirements which the experience of such employee in the preceding jobs makes it possible for the employee to learn in a substantially shorter time than a new, inexperienced employee."

23. The Company apparently paid all the transferees under the provisions of Article X, Section 2(a) (5):

(a) An hourly rated employee on daywork when permanently transferred

\* \* \* \* \*

(5) to any daywork job, will receive the job rate of the job to which he is transferred for normal performance, but if after transfer he is on a progression schedule and receiving less than the job rate, he will progress to that job rate on steps in accordance with the applicable progression schedule; if not on a progression schedule he will progress to the job rate on the basis of performance.

ance." The Company, however, appeals on the ground that Article XV, Sections 7(e) and (f) exclude these grievances from compulsory arbitration.

It should be apparent from our prior discussion that Section 7(e) is not a bar to arbitration. A decision by the arbitrator favorable to the Union will require the Company to pay the employees pursuant to the provisions of Article X, Section 2(a) (2) or (3), whichever is applicable. That decision making process cannot be termed the discretionary rate setting at which Article XV, Section 7(e) was directed.

Article XV, Section 7(f), which was not considered in the *1968 Case,* requires closer analysis at this point. That section provides:

> * * * In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they
>
> * * * * * *
>
> (f) Would require an arbitrator to consider, rule on or decide any of the following:
>
>> (i) The elements of an employee's job assignment;
>>
>> (ii) The level, title or other designation of an employee's job classification;
>>
>> (iii) The right of management to assign or reassign work or elements of work.

The *1968 Case* instructed that the exclusionary clauses of Article XV should be interpreted strictly, and where appropriate, in favor of arbitration.[24] Even if we were not to rely on this doctrine of construction, we would conclude that the grievances are arbitrable.

Section 7(f) appears to parallel Section 7(e). As in the case of Section 7(e), which was intended to preserve management discretion over rate setting, Section 7(f) was intended to preserve management discretion over job classification and assignment.[25] For example, the arbitrator would not have the power under the contract to determine that all "boilerhouse operators" on a plant-wide or company-wide basis must perform certain functions and could not be compelled to perform others. Once the company determines, however, that a boilerhouse operator must perform certain functions, it does not infringe on management discretion if he determines that a particular employee is capable of "normal performance" of those functions. Nor does it infringe on management discretion if the arbitrator determines that one job, as constituted by the Company, is daywork "related" to another job. Certainly, to decide that an employee under his job assignment is performing tasks required by the Company and that the conglomeration of those tasks fits the definition the Company established is hardly to decide "the elements of an employee's job assignment."

### N.D. 10028—Binding Effect of Prior Arbitration Awards

■ The final grievance before us concerns the binding effect of prior ar-

---

24. Moreover, even if the command of the Agreement not to "proceed under any presumption" of arbitrability could overrule this line of cases, we regard that language as inapplicable where the determination that a dispute is arbitrable has already been made not by use of such a presumption but only on the basis of the limited language of the contract, and the only question left is the effect of specific exclusionary language.
*1968 Case* at 263.

25. Our conclusion that Article XV, Sections 7(e) and (f) have the limited design of protecting management discretion is buttressed by a footnote to Section 7:

> Footnote: Subsections e, f, and g above reflect the fact that this National Agreement does not set out specific rates or classifications for jobs, and are designed to confirm the intent of Article VI, Section 1 and Article VI, Section 5 (first sentence) that disputes over individual job classifications, rates of pay, incentive standards, etc., are assigned by the parties to local negotiations, and not to arbitration.

> Disputes left for negotiations are generally those which involve rates and classifications which affect employees in general, and not those which affect individual employees. *See also 1968 Case* at 262 n. 14.

bitration awards. Article XV, Section 5 provides that "[t]he power of the arbitrator shall include the authority to render a final and binding decision with respect to any dispute brought before him * * *."

In 1962 an arbitrator (N.D. 5843) decided that the Company had violated Article VI, Section 4(b) by changing a standard piece price without making a corresponding change in methods of production for part of the operations on Navy upper gear casings for submarines. Although the Company restored the standard price to comply with the arbitration award, it shortly thereafter reduced the price on other naval gear units. The Union contends that the Company violated the terms of the arbitration award and thus Article XV, Section 5 of the Agreement. Judge Cooper held that the grievance involves a direct violation of the express purpose of Article XV, Section 5 and is therefore arbitrable under Article XV, Section 6(a) (ii).

The Company's argument on appeal is two-fold. First, it contends that Judge Cooper should have interpreted Article XV, Section 5, because it is part of the arbitration clause of the Agreement. In addition, it claims that the district judge should have examined the facts of the grievance to determine whether the jobs in question were covered by the 1962 arbitration award.

It is true, of course, that the courts, and not the arbitrator, have the primary responsibility to interpret the language used in the provisions governing the jurisdiction of the arbitrator. *See American Mfg. Co., supra,* at 570, 80 S.Ct. 1343

(Brennan, J., concurring); *1968 Case* at 265. But Article XV, Section 5 is not a clause of this character. The only provision that defines the jurisdiction of the arbitrator which is in question here is Article XV, Section 6(a) (ii).[26]

Assuming *arguendo* the Company was correct in its first contention, we believe it would be an abuse of our jurisdiction to examine the contested factual issues. In the *1968 Case* the Court examined the factual contentions in the Union's grievance to determine whether they made out a *prima facie* right to arbitration under Article XV, Section 6(a) (i), which governs the right to arbitration of disputes which involve disciplinary actions. The facts alleged by the Union in N.D. 10028 support the arbitrator's jurisdiction under Article XV, Section 6(a) (ii). Once this court makes that determination, it is for the arbitrator to resolve the factual dispute on the merits in light of the applicable contract provisions.

Before closing with the traditional word of disposition, we again voice the hope that the parties will abandon that strategy which requires federal courts to play the role of *parens patriae* in their labor disputes. That such a course results in a disposition of grievances at a snail's pace is obvious from the history of the case before us which dates back to May 1968 when the complaint was filed in the district court. The courts' resources are not unexpendable, and we must insist that the parties recognize their responsibilities to settle grievances of individual employees with dispatch. Delay is a concomitant of drawing in the federal courts.

Affirmed.

---

26. The Company cites Local 616 v. Byrd Plastics, Inc., 74 LRRM 2550 (3d Cir. 1970) to support its claim that the "binding effect" language of the contract should be construed by this court as analogous to the legal principle of *res judicata*. *Byrd Plastics*, however, was a suit which dealt with the enforcement of an arbitration award, not the arbitrability of a dispute.