**WESTVACO CORPORATION, Plaintiff,**

v.

**UNITED PAPERWORKERS INTERNATIONAL UNION, LOCAL 1388, AFL–CIO, Defendant.**

**No. 76 Civ. 3109–CSH.**

United States District Court, S. D. New York.

Oct. 6, 1976.

Clifton, Budd, Burke & Demaria, New York City, for plaintiff; Kevin J. McGill, New York City, of counsel.

Benjamin Wyle, New York City, for defendant.

## MEMORANDUM AND ORDER

HAIGHT, District Judge:

Plaintiff Westvaco Corporation ("Westvaco") sues to enjoin defendant United Paperworkers International Union, Local 1388, AFL–CIO (the "Union") from proceeding to arbitration of a dispute allegedly arising out of a collective bargaining agreement between Westvaco and the employees of its mill at Tyrone, Pa.

The Union moves for an order dismissing the complaint, for summary judgment, for judgment on the pleadings, and for such other relief as may be appropriate.

Disregarding to some extent the precise form of the original pleadings in order to confront the substantive issues, the Court will treat the case as a motion by Westvaco to enjoin arbitration, and a cross-motion by the Union to compel arbitration. This Court has jurisdiction to grant either remedy under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *Sperry Systems Management Division v. Engineers Union*, 371 F.Supp. 198, 200 (S.D.N.Y. 1974); *Charmers Industries, Inc. v. Liquor Salesmen's Union*, 415 F.Supp. 781, 783 (S.D.N.Y.1976).

I deny Westvaco's motion to enjoin arbitration and grant the Union's cross-motion to compel.

The collective bargaining agreement between the parties (hereinafter the "contract") was made effective on February 17, 1974. Its original term was through February 16, 1976. The parties agreed to extend the contract for an additional year, from February 17, 1976 to February 17, 1977.

Article 1 of the contract provides, in essence, that it is applicable "to all production and maintenance employees . . . at the Westvaco Plant, Tyrone, Pennsylvania", with certain exceptions not here pertinent.

Article 20, captioned "PENSIONS", provides:

"The present Pension Plan will be continued during the life of this Agreement, unless mutually agreed otherwise as a result of discussions during the term of this contract."

Article 24, captioned "GRIEVANCES AND ARBITRATION", provides in Section 1:

"Issues subject to the grievance procedure are limited to differences arising out of the interpretation, application or alleged violation of any provision of this Agreement; and differences relative to working conditions not specifically covered by this agreement which are of such detail or minor character as not to involve fundamental principles or relationships or any substantial economic advantages or disadvantages to the parties."

Section 2 of Article 24 sets up machinery by which disputes pass through several steps of the grievance procedure, involving increasingly senior representatives of Company and Union. Ultimately the Company makes known its decision on the disputed issue. The Union then has thirty days to notify the Company in writing "whether it will proceed to arbitrate", Section 2, sub-para. Fourth. Arbitration, if demanded, is conducted in accordance with the rules of the American Arbitration Association. The arbitrator's decisions are binding on the parties. Section 2, sub-para. Fifth (a).

Article 24, Section 2, sub-para. Fifth (d) provides:

"The arbitrator shall have no power to add to, subtract from, or amend any of the terms of this Agreement."

### The Dispute

The Union seeks arbitration of its claim that Westvaco has breached Article 20 of the contract, relating to pensions, by failing to provide increased pension benefits to the Tyrone mill employees while granting such increases to employees of other facilities in the Westvaco complex.

This issue arises in the following manner. Westvaco is engaged in the manufacturing, processing and distribution of paper, paper products and chemicals. The Company owns a number of mills and other facilities around the country. Thus there are Westvaco mills at Luke, Maryland and Covington, Virginia (the "Appalachian mills"); other mills exist at Charleston, South Carolina, Mechanicville, New York, and Tyrone, Pennsylvania. The present case involves employees at the Tyrone mill.

From some time prior to 1963 until the present time, Westvaco has been a party to a multi-plant collective bargaining agreement covering certain employees at the Appalachian mills. In or about 1963, the subject of pensions was introduced during negotiations for a renewal of Westvaco's agreement with the Appalachian mills. It has been Westvaco's practice to invite union representatives from the Company's other facilities to attend these pension discussions, although Westvaco emphasizes that the individuals in question attended the negotiations only as observers, and Westvaco reserved the right to offer negotiated pension benefits to employees at other facilities or not, as it chose.

The Union sharply disputes that contention. It is the basic factual premise of the Union that pensions were negotiated on a multi-plant basis; and that agreements reached in negotiations on that subject were binding on the parties, subject only to ratification by the Union members affected by the changes.

It appears from the papers before me that, in or about 1969, Union representatives of the Tyrone mill, recently organized, began attending Westvaco's negotiating sessions with the Appalachian mills. Over a number of years such negotiations resulted in a common pension benefit offer to all the mills, which the various unions (includ-

ing the defendant Union, representing the Tyrone employees) submitted to their membership for ratification.

In 1973, after Westvaco had concluded its pension negotiations with the Appalachian mills, it again offered the negotiated pension benefits to the other mills. Several unions at the Charleston, South Carolina mill advised Westvaco that they would not accept the offer. In consequence, a different pension settlement was reached in further negotiations between Westvaco and the union at Charleston. The defendant Union, however, accepted the Company's negotiated settlement with the Appalachian mills concerning pension improvements.

It is that pension plan, first negotiated by Westvaco and its employees at the Appalachian mills, and thereafter offered to and accepted by the defendant Union at the Tyrone mill, which is referred to in Article 20 of the contract between plaintiff and defendant. As noted above, that contract became effective on February 17, 1974; was originally intended to run for two years; and by consent of the parties was extended (in mid-1974) to run for an additional year, terminating in February, 1977.

This one-year extension had been offered by Westvaco to all its mills. The Appalachian mills rejected the extension offer.

In consequence of that rejection, full contract negotiations between Westvaco and the employees in the Appalachian mills began in October of 1975. Pension benefits were, of course, on the agenda. Prior to the commencement of these negotiations, Westvaco advised the defendant Union that, as in the past (in Westvaco's contention) it was negotiating only for the Appalachian mills; and that this time the Appalachian pension settlement would not be offered to the defendant Union. Notwithstanding this advice, representatives of the Union made an initial appearance at the Appalachian negotiations, thereafter withdrawing.

The negotiations with the Appalachian mills resulted in increased pension benefits for the employees at those mills. Subsequently, the defendant Union requested a meeting with Westvaco concerning increased pension benefits. The parties met for discussions, which came to nothing. The Union's demand for arbitration followed.

### The Union's Theory of Recovery

The Union claims a violation by Westvaco of Article 20 of the contract, which, as noted above, provides:

> "The present pension plan will be continued during the life of this Agreement unless mutually agreed otherwise as a result of discussions during the term of this contract."

It is common ground between the parties that increased pension benefits were extended to certain of Westvaco's mills, and were withheld from the employees at the Tyrone mill (these increased benefits apparently became effective in April of 1976). The Union contends that this action on Westvaco's part constitutes a violation of Article 20, in one of two respects: (1) the Union contends that there is one pension plan for all of Westvaco's mills;[1] that Westvaco had always applied the existing plan to the employees of all its mills; and that therefore Westvaco's failure to apply the increased benefits for 1976 to the Tyrone employees constitutes a failure to continue "the present Pension Plan".

(2) Alternatively, the Union contends by granting improved benefits to the employees of some of its mills, while withholding such benefits from the Tyrone employees, Westvaco changed the pension plan in effect during the term of the contract without the mutual agreement required by Article 20.

While the Union states these contentions in the alternative, it is apparent that they both proceed from the same fundamental factual premises: namely, that the pension

---

1. That contention is cast somewhat into doubt by the separate pension settlement with the Charleston mill, referred to *supra*.

plan should be regarded as a single contractual entity, binding upon Westvaco and benefiting all employees who elect to receive such benefits; that in consequence the 1975 negotiations with the Appalachian mills, which resulted in increased pension benefits for the employees of those mills, must be regarded as pertinent to the "pension plan" referred to in the 1974 contract between the parties to this litigation; and that accordingly the granting of increased benefits to the Appalachian employees, while denying them to the Tyrone employees, without the latter's consent, constitutes a violation of Article 20 of the contract between Westvaco and the Union representing the Tyrone employees.

### Westvaco's Theory of Defense

Westvaco contends with vigor that the October, 1975 pension negotiations with the Appalachian mills cannot possibly inure to the benefit of the employees at Tyrone. Westvaco contends that it has consistently made it clear to the representatives of its several mills that such pension benefits, negotiated initially with the Appalachian mills, may or may not be offered to the other mills, entirely at Westvaco's option.

Consistent with that position, Westvaco argues that the contract in suit applies only to the Tyrone employees; and that actions occurring outside the Tyrone unit, affecting employees of other bargaining units, cannot be pertinent in any way to the rights and obligations of the parties to the contract in suit.

Focusing upon the phrase "present Pension Plan" in Article 20 of the contract, Westvaco contends that the phrase "can only mean the maintenance of the $6.50 level which was in existence at Tyrone when that language was executed in 1974. There is no other possible interpretation."

### The Proper Function of the Court

While I have set forth the contentions of the parties on the merits in some detail, my purpose was solely to place the dispute in perspective. The Court's proper function, in a case of this nature, is not to evaluate the merits, but rather to determine whether the dispute is arbitrable under the contract.

The decisive issues between the parties would appear to be:

(1) What is the proper meaning of the phrase "the present Pension Plan", as that phrase is used in Article 20 of the contract?

(2) Under the proper interpretation of the phrase "the present Pension Plan" as used in the contract, does the outcome of the 1975 negotiations between Westvaco and the Appalachian mills have any effect upon the Tyrone employees' rights, and Westvaco's obligations, arising out of the contract between those parties?

The question for the Court is not how those questions should be answered on their merits. The question is whether those issues, and the underlying dispute, are arbitrable. I hold that they are, and turn to a consideration of the pertinent authorities.

### The Arbitrability of the Present Dispute

Under Article 24 of the contract, the issues subject to grievance procedure and arbitration are defined as:

".   .   . differences arising out of the interpretation, application or alleged violation of any provision of this Agreement;  .   .   ."

This is the standard, broad-form arbitration agreement which was considered in the three Supreme Court decisions known as the "steelworkers trilogy": *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

The thrust of the "trilogy", and the reaction of at least one industry to the effect of those cases, is discussed in an instructive opinion by Chief Judge Kaufman in *International Union of Electrical, Radio & Machine Workers v. General Electric Company*, 450 F.2d 1295, 1297 (2d Cir. 1971):

"Prior to 1963, the collective bargaining agreement between the Union and General Electric included the typical 'standard' arbitration clause, which provided that all disputes involving 'the interpretation or application of a provision of this Agreement' were subject to arbitration . . . This arbitration clause was changed drastically in the wake of three Supreme Court decisions dubbed the *steelworkers trilogy* . . . The *trilogy* instructed that the national labor policy favors arbitration of all labor disputes and, accordingly, that courts interpreting arbitration clauses of collective bargaining agreements should resolve all doubts in favor of arbitration. The 1963–1966 agreement deliberately sought to avoid the implications of the *trilogy* presumption by sharply and narrowly defining disputes which were to be subject to compulsory arbitration."

In the case at bar, the "standard" arbitration clause survives; and accordingly the full implications of the "steelworkers trilogy" come to bear upon the issue of arbitrability.

It is not necessary to recite at length the facts or the holdings of the trilogy cases. However, two characteristic statements may be observed. In *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. at p. 583, 80 S.Ct. at p. 1353, the Court said:

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted disputes. Doubts should be resolved in favor of coverage."

In *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. at pp. 567–568, 80 S.Ct. at p. 1346, the Court stated:

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract."

These declarations by the Supreme Court constitute the affirmative and negative expressions of the same concept. That is to say, a party under the broad-form arbitration agreement is entitled to arbitration of any claim "which on its face is governed by the contract"; conversely, the party resisting arbitration must demonstrate that "the arbitration clause is not susceptible of an interpretation that covers the asserted disputes."

The quotation from *International Union of Electrical, Radio & Machine Workers v. General Electric Company, supra*, at 450 F.2d p. 1297, indicated that the grievance and arbitration provisions of the contract in that case were drafted in a deliberate effort to narrow the concept of arbitrability, thereby escaping the thrust of the steelworkers trilogy. When the contract between the union and General Electric Company first reached the Second Circuit, 407 F.2d 253 (2d Cir. 1968), *cert. den.*, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217, the union argued that the revised language really had not changed the result mandated by the trilogy cases. In his opinion rejecting that contention, Judge Feinberg furnishes us with insights as to the proper interpretation of a broad-form trilogy arbitration agreement. "The Union contends", Judge Feinberg wrote, "that we are faced with exactly the sort of unrestricted arbitration clause to which the *Steelworkers* cases were directed." Judge Feinberg goes on to observe:

"But the 1963 contract is obviously different from the agreements in those cases. Arbitration as of right is clearly limited to matters involving 'disciplinary action' and 'claimed violation of a specific provision' of the Agreement; an 'implied or assumed obligation' is specifically excluded from arbitration as a matter of right; 'violation of a specific provision' is further qualified as 'a direct violation of the express purpose of the contractual provision'; examples are given in an attempt to clarify the difference between an 'express' and an 'implied' purpose; a

court is told that no matter is arbitrable unless it finds that the parties 'clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth' in the contract; and finally, a court is instructed not to 'proceed under any presumption' of arbitrability." 407 F.2d at p. 258.

Those issues sought to be excluded in the revised, narrowed General Electric contract remain for the consideration of arbitrators under the broad-form arbitration agreement, which was presented in the steelworkers trilogy, and is presented in the case at bar. Thus it is open to the Union in the case at bar to attempt to persuade an arbitrator that Westvaco's prior pattern of pension benefits negotiations, when viewed in all the circumstances of the case, give rise to an "implied or assumed obligation" within the context of Article 20 of the contract at bar. Westvaco, of course, strenuously contends that no such obligation arises. I do not suggest for a moment that I agree with the Union, or disagree with Westvaco. It is not appropriate for the Court to entertain an opinion on the question, and in fact I have none. But I am persuaded that the Union is asserting a claim "which on its face is governed by the contract".

■ It is well settled that, where a broad-form arbitration agreement is involved, disputes concerning the implication of rights or obligations within the overall contractual scheme go to the merits, and must be resolved by the arbitrator. Thus in *Local 12298, District 50, United Mineworkers of America v. Bridgeport Gas Company*, 328 F.2d 381 (2d Cir. 1964), the union and employer disputed whether a collective bargaining agreement required the employer to post notices of vacancy, although the employer had determined there was insufficient work to justify filling a position left vacant by an employee's retirement. A subsidiary question was whether the power to refuse to fill the vacancy was a management function which could be implied in the power to relieve an employee from duty. The Second Circuit held that whether or not the contract, viewed in its entirety, gave

rise to such an implication must be determined by the arbitrator:

"It may be that the power to refuse to fill a vacancy can be implied from the power to relieve an employee from duty, but that is a question as to the merits of the grievance and must be left to the arbitrator. Moreover, the processing of even frivolous claims may have a therapeutic value in preserving industrial peace. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)." 328 F.2d at p. 384.

■ In the case at bar, the following facts emerge, apparently without dispute. In 1974, Westvaco and the Union entered into an agreement which provided, in Article 20, that "the present Pension Plan will be continued during the life" of the contract unless mutually otherwise agreed. At the time that contract was entered into, the only pension plan then in existence (defendant's Exhibit 14), effective as amended April 1, 1973, defined an "employee" as "any person regularly employed by the Company" on a certain basis (Article 1f), and further defined the "members" of the plan as:

"Each person employed by the Company other than at its Mechanicville, New York or Charleston, S.C. plants, who on March 31, 1973 was a member of the Plan as in effect on March 31, 1973 shall become a Member of the Plan as in effect on and after April 1, 1973."

Under the scheme implemented by this pension plan, Westvaco's employees at the Appalachian mills and at Tyrone received equal treatment and equal benefits. That condition of parity was changed when, in 1975, while the contract between Westvaco and the Tyrone union was still in effect, the Appalachian mill employees were granted increased pension benefits from which the Tyrone employees were excluded. The dispute, in essence, is whether this departure from parity constitutes a violation of rights of the Tyrone employees, arising either out of the express provisions of the contract, or the fair implications of that contract when

viewed in the light of all the circumstances. Again, without expressing any opinion as to the outcome of that question, I hold that it must be resolved by the arbitrators.

Even in those cases which involve post-trilogy, narrowed arbitration clauses, such as that presented in the *General Electric* cases, arbitration of disputes is favored and the parties seeking to enjoin arbitration bear a substantial burden of proof. Plaintiff's supplemental memorandum purports to quote Judge Feinberg in *IUE v. General Electric Company, supra,* at 407 F.2d 253, 261 n. 13:

> "If 'it is the plaintiff's position that the mere allegation that the agreement has been violated, ipso facto, entitles it to arbitration,' that position 'is devoid of all logic.'"

In point of fact, the quotation is from *Independent Petroleum Workers of America v. American Oil Co.,* 324 F.2d 903 (7th Cir.), aff'd, 379 U.S. 130, 85 S.Ct. 271, 13 L.Ed.2d 333 (1964), a case which Judge Feinberg cited, together with *Boeing Co. v. International Union,* 349 F.2d 412 (3d Cir. 1965), in support of his conclusion that certain disputes in the *General Electric* case were not arbitrable. It is instructive to consider these three cases, all of which involved narrow or restricted, post-trilogy arbitration clauses.

In the *Independent Petroleum Workers* case, the union sought arbitration of a grievance arising out of the company's action in contracting out crane work to an independent contractor. The collective bargaining agreement contained no provision whatsoever with respect to contracting out work. The narrowed, post-trilogy arbitration clause in the contract limited arbitrable disputes to questions directly arising from "alleged violations of the terms of this agreement." In the absence of any term referring to the contracting out of work, the Seventh Circuit held that the grievance was not arbitrable. The court stated generally:

> "In other words, it is plaintiff's position that the mere allegation that the agreement has been violated, ipso facto, entitles it to arbitration. This position, if accepted, means that either party by alleging a refusal of the other to bargain with respect to any conceivable issue or controversy would become subject to arbitration." 324 F.2d at pp. 906–7.[2]

In the *Boeing* case, the union sought arbitration of a dispute arising out of the employer's decision to terminate the distribution of Christmas turkeys to its employees. Arbitration under the contract was limited to grievances involving a "specific provision of this agreement . . ." In the absence of any provision dealing with the distribution or withholding of Christmas turkeys, the Third Circuit refused arbitration.

In the first *General Electric* case in the Second Circuit, Judge Feinberg's opinion denied arbitration in respect of a dispute dealing with pricing and manufacturing methods. As noted above, the arbitration provisions in the *General Electric* agreement were complex and intended to narrow the scope of the trilogy rule. In holding that certain disputes were not arbitrable, Judge Feinberg observed:

> "But the Union cites no specific language which even deals with restraints upon the Company in setting new Special piece prices or altering the method of manufac-

---

**2.** Significantly, the employer's right to contract out work, while laying off employees who could have performed such work, was held to be arbitrable in one of the trilogy cases, *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), in which the Court said:

> "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. . . . The grievance alleged that the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute 'as to the meaning and application of the provisions of this Agreement' which the parties had agreed would be determined by arbitration." 363 U.S. at pp. 584–5, 80 S.Ct. at p. 1354.

The same standard applies to the case at bar.

ture on such jobs. . . . It is true that the Union has gone through the form of citing a section of the contract, which it says has been violated. But under these complex arbitration provisions it must do more; it must at least rely on specific language that arguably expressly covers the 'subject' of the grievance. It has not done so here. As the Union does not indicate any other provision violated by the Company's actions in these two instances, the grievances are not arbitrable as of right under Article XV, section 6(a)(ii)." 407 F.2d at pp. 260–1.

It is apparent that even within the context of a restricted, post-trilogy arbitration clause, an arbitrable dispute is presented if an arguable claim arises out of an express provision of the contract. In the case at bar, that requirement is satisfied by the provision in the contract that the "present Pension Plan" (which we have seen achieved parity among Westvaco employees at the time of inception of the contract) would be continued during the lifetime of the contract, unless mutually agreed otherwise. Thus, even if the Court were presented with a restricted, post-trilogy arbitration agreement, I would conclude that this dispute is arbitrable. *A fortiori*, I reach that conclusion within the context of a broad-form, trilogy arbitration agreement.

I have considered the plaintiff's other contentions, and find them to be without merit. The exclusionary language appearing in the latter part of Article 24, Section 1, limits those differences "relative to working conditions" which may be submitted to arbitration, but we are not dealing with "working conditions" in this dispute. The provision in Article 24, Section 2, sub-para. Fifth(d) that the arbitrator has no power "to add to, subtract from, or amend any of the terms of this Agreement", may give Westvaco a subsequent opportunity to persuade a reviewing court that, in issuing their award, the arbitrators exceeded their powers; however, that question must be determined in the light of the arbitrators' award, and the contractual language in question does not undermine the teachings of the trilogy cases and their progeny on the threshold question of arbitrability. *Torrington Co. v. Metal Products Workers Union, Local 1645*, 362 F.2d 677 (2d Cir. 1966); *International Association of Machinists v. Howmet Corporation*, 466 F.2d 1249 (9th Cir. 1972).

The *International Association of Machinists* case, *supra,* furnishes a useful example of the implementation of the steelworkers trilogy principle. The case stands for the proposition that:

"[T]he complete silence of an agreement on the issues sought to be arbitrated is not sufficient evidence to meet the rigorous standard set by the *Steelworkers Trilogy* for a finding of nonarbitrability." 466 F.2d at p. 1252.[3]

The Ninth Circuit concluded, as I do in the case at bar, with the observation that determination of the threshold question of arbitrability has nothing to do with the merits of the dispute:

". . . the court has merely made the threshold decision that the collective bargaining agreement is susceptible of an interpretation making the dispute arbitrable, i. e., the issue is prima facie arbitrable. The arbitrator should not be prevented from deciding whether or not he will so interpret the agreement." 466 F.2d at p. 1256.

### Conclusion

For the foregoing reasons, the complaint is dismissed; plaintiff's motion to enjoin arbitration is denied; and defendant's cross-motion to compel arbitration is granted.

In the exercise of my discretion, I decline to award costs.

It is So Ordered.

---

3. *A fortiori*, that rigorous standard is not met where, as here, the agreement is not silent but specifically speaks to the issue of pensions.